Sande WRIGHT, Appellant,

v.

James and Catherine VICKARYOUS,
Appellees.

James and Catherine VICKARYOUS,
Cross-Appellants,

v.

Sande WRIGHT, Cross-Appellee.

Nos. 4079, 4080.

Supreme Court of Alaska.

Aug. 3, 1979.

Ernest Z. Rehbock, Rehbock & Rehbock, Anchorage, for appellant/cross-appellee.

Richard R. Huffman, Kemppel, Huffman & Ginder, Anchorage, for appellee/cross-appellants.

Before RABINOWITZ, C. J., BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

This is a dispute between two stubborn Matanuska Valley farmers, Sande Wright and Jim Vickaryous, arising from a lease agreement for Cottonwood Dairy Farm.[1]

Wright challenges several aspects of the trial court's decision: the order allowing amendment of the complaint, the construction of the lease as a month-to-month tenancy and the Vickaryouses' right to crops harvested by Wright, a holdover tenant. Further, Wright challenges various rulings relating to damages, including application of the collateral source rule to insurance proceeds received by a landlord.

Sande Wright badly needed a place to put his cows.[2] James and Catherine Vickaryous were looking for a tenant for their dairy farm, Cottonwood Dairy, to avoid a foreclosure. On May 19, 1975, the parties signed an "Interim Lease Agreement," set out in Appendix A, providing that Wright should rent Cottonwood Dairy for a monthly rental of $1,500.00.[3] Wright took possession immediately.

Wright believed the Interim Lease Agreement was a five-year lease and the parties understood that Wright would work to improve Cottonwood Dairy's facilities.

Vickaryous believed the interim agreement was a temporary agreement, preliminary to a formal lease drawn by an attorney, which would be acceptable to both their creditors and would specify responsibility for improvements.[4] Vickaryous spent approximately $5,000.00 in attorney's fees negotiating with Wright about a lease. Vickaryous concluded in mid-December that Wright was not participating in the negotiations in good faith and was not interested in signing a lease. By letters of December 12 and 20, Vickaryous gave Wright notice to quit the premises.

Wright paid no rent from December 1975 until March 1976,[5] when the Vickaryouses filed suit alleging that Wright's failure to

1. This case involved many accusations and counter-accusations and both sides felt strongly about the issues. We commend Judge Occhipinti for the patience, hard work and attentiveness to detail that is evident throughout the seventeen volumes of trial and motion transcripts comprising this record.

2. A fire had destroyed his barn, and he was finding the barn to which he had moved extremely unsatisfactory.

3. The parties also signed a promissory note for the purchase of chattel: cows, equipment, and fertilizer. No issue relating to the promissory note is before this court.

4. Vickaryous stated that he told Wright he would try to get a line of credit for improvements, and if he were successful, rent in the eventual lease would reflect that additional cost.

5. Wright said that he paid no rent because the Vickaryouses had not kept their promise to improve the farm, and he spent what would have been rent making those improvements. Wright filed a counterclaim for damages resulting from the Vickaryouses' alleged breach of contract.

pay rent made his possession of Cottonwood Dairy unlawful and that Wright's possession caused them damage.[6] The Vickaryouses received a temporary order directing Wright to pay rent. In June, before trial, the Vickaryouses amended their complaint, over Wright's opposition, to allege that his possession was unlawful because the Vickaryouses had terminated Wright's lease, which had established only a month-to-month tenancy.

The trial was bifurcated. The first part occurred in July 1976 and determined the right to possession of Cottonwood Dairy. The bulk of the testimony was from Wright and Vickaryous.[7] The court found that Wright had been in unlawful possession of Cottonwood Dairy since the December notices to quit and issued a preliminary injunction returning possession of the farm to the Vickaryouses. By that order, the court also awarded hay crops from Cottonwood Dairy to the Vickaryouses.[8]

The trial on damages lasted eight days in April and May 1977, and painstakingly covered all the specific claims of both sides. Basically, Vickaryous alleged that Wright had neglected the premises, that Wright's efforts at repair had only made things considerably less functional, and that Wright's negligence was responsible for a fire that occurred on Cottonwood Dairy. Wright alleged that the farm was in terrible shape when he moved in, that it could not operate properly as a dairy farm for Wright's herd, that he (Wright) had only improved the

farm, and that the fire was not the result of his negligence. The trial court eventually found that Wright owed the Vickaryouses approximately $70,000.00 in damages less an offset for $18,000.00 worth of equipment and fertilizer Wright had used on the farm.[9]

Wright appeals the decision on the right to possession of the farm, the hay crops,[10] and particular items of damages. The Vickaryouses cross-appeal the offset.

We affirm the decision on possession of the farm: the trial court did not abuse its discretion by permitting the Vickaryouses to amend their complaint, and the record supports the finding of a month-to-month tenancy. We find error in the award of the hay crops to the Vickaryouses. We affirm the trial court's decision on damages, except for two items: award of attorney's fees for unsuccessful lease negotiations, and the failure to reduce the Vickaryouses' award by the sum they received from fire insurance. On the cross-appeal, we affirm the offset awarded to Wright, except for costs incurred to grow the hay crops.

## I. THE AMENDED COMPLAINT

The Vickaryouses' initial complaint alleged that Wright was in unlawful possession of Cottonwood Dairy Farm because Wright owed three months rent. The affidavit in support of the complaint stated that James and Catherine Vickaryous

> executed a lease agreement with the defendant, Mr. Sande Wright, *whereby we agreed to lease to Mr. Wright Cotton-*

---

**6.** Their complaint alleged that Wright's possession violated Alaska's forcible entry and detainer statute. *See* AS 09.45.060 to AS 09.45.160.

**7.** Doug Jacobsen, the state agricultural loan administrator who was present when the parties signed the Interim Lease Agreement, Catherine Vickaryous, and Ruth Wright also testified. Jacobsen's testimony was inconclusive: parts suggest the Interim Lease Agreement was a five-year lease, other statements point to month-to-month status.

**8.** The record suggests the hay had just been harvested at the time of trial, around July 13.

**9.** Wright also received a $1,000.00 offset for a security deposit which is uncontested.

**10.** At the end of the first half of the trial, the trial court said that it was giving Wright "one week in which to perfect [his] appeal." The Vickaryouses allege that Wright's failure to appeal within seven days waived his right to challenge the decision on possession of the farm and the hay crops. That order was a preliminary injunction; there was no final order or judgment. Wright quite correctly alleges:

> The question presented is not whether [Wright] could have sought discretionary review of the interlocutory disposition. The record indicates that he did not so elect. The question is only whether the order was a final judgment on which appeal must be taken within 30 days of entry.

*wood Dairy for a period of five years* in exchange for monthly rental payments in an amount of $1,500.00. [emphasis added]

In response to this complaint, Wright paid rent to the registry of the court which in turn dispensed it to the Vickaryouses.

The trial court permitted the Vickaryouses to amend their complaint to state that Wright's possession was unlawful because Wright's lease had been terminated. The amended complaint stated that Wright and the Vickaryouses had a

*written month to month rental agreement for Cottonwood Dairy farm . . .* which rental agreement permitted defendant to occupy the premises until the parties could negotiate a lease for a longer period of time. [emphasis added]

■ The trial court permitted amendment pursuant to Alaska Civil Rule 15(a)[11] which is identical to the federal rule governing amendment of pleadings, Federal Civil Rule 15(a). Trial courts have broad discretion in deciding whether to grant leave to amend.[12]

■ The Supreme Court described in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962), the conditions under which denial of an amendment might be proper:

Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. See generally, 3 Moore, Federal Practice (2d ed. 1948), ¶¶ 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. —the leave sought should, as the rules require, be "freely given."

This court has stated:

Probably the most frequent reason for denying leave to amend is that it would be prejudicial to the opposing party. The prejudice can result from the opposing party being put to an added expense, a more burdensome and lengthy trial, or if the issues being raised in the amendment are remote from the scope of the original case.

*Estate of Thompson v. Mercedes-Benz, Inc.,* 514 P.2d 1269, 1271 (Alaska 1973) (footnotes omitted).[13]

■ Wright argues prejudice on three grounds. First, he claims surprise by the new theory of a month-to-month lease. The amended complaint, however, only introduced a new theory; the Vickaryouses were still suing on the same conduct of Wright which was the subject of the initial complaint.[14] The change in theory to a month-to-month lease did not widen the scope of the dispute and this amendment is

---

11. Alaska R.Civ.P. 15(a) specifies:

 *Amendments.* A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

12. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222, 226 (1962); *Estate of Thompson v. Mercedes-Benz, Inc.,* 514 P.2d 1269, 1271 (Alaska 1973); *Romo v. Reyes,* 26 Ariz.App. 374, 548 P.2d 1187, 1187 (1976).

13. Even if a party is prejudiced, the prejudice must be balanced against the hardship to the moving party if leave to amend is denied. *Romo v. Reyes,* 548 P.2d at 1188.

14. The court noted in *Chamberlin v. United Engineers & Constructors, Inc.,* 194 F.Supp. 647, 650 (E.D.Pa.1961):

 The [Federal Rules] have shifted emphasis away from a theory of law as to the cause of action to the specified conduct of the defendant upon which the plaintiff relies to enforce his claim. [citation omitted]

equivalent to other amendments that courts have permitted.[15]

■ Furthermore, the remedy for inadequate time to prepare on a new theory is a continuance, not preventing a trial on the merits of the new theory. Wright received the one twenty-day continuance he requested. He did not argue that twenty days was inadequate for trial preparation.[16] The court's comment in *Scott v. Baltimore & O. R. Co.,* 151 F.2d 61, 64 (3d Cir. 1945), is apt:

> The only injustice to the defendant in such a situation is when he is compelled to go on with the trial and meet a new point which is a surprise to him and on which he has had no opportunity to prepare. That situation is not claimed by the defendant to exist here and, therefore, his point completely disappears. [footnote omitted]

■■ Second, Wright implicitly assumes that the inconsistency between the first pleading with its supporting affidavit and the amended pleading proves by itself that the amendment was in bad faith and estops

the Vickaryouses from making the amendment. The trial court did not find that the Vickaryouses' original complaint or the amendment was in bad faith, and the record supports that determination.[17] Professor Moore states the correct general rule:

> The fact that an amendment involves a departure from the facts previously alleged is no bar to its allowance, since consistency in pleadings is not required.

3 Moore's Federal Practice ¶ 15.08[2], at 15–71 (2d ed. 1948) (footnote omitted).[18]

■ Wright's final claim of prejudice is that his payment of rent for the previous months was a complete defense under the initial complaint, but it was not under the amended complaint.[19] Assuming this is true, Wright does not show prejudice simply because the Vickaryouses were more likely to succeed under the amended complaint; presumably, that is the purpose of any amendment offered by a plaintiff. As the court stated in *Chamberlin v. United Engineers & Constructors, Inc.,* 194 F.Supp. 647, 649 (E.D.Pa.1961):

---

**15.** *Compare Ozark Air Lines, Inc. v. Delta Air Lines, Inc.,* 63 F.R.D. 69, 72–73 (N.D.Ill.1974) (amendment permitted, four and a half years after commencement of the suit, to allege the plane was owned, rather than rented, by defendant); *Davis v. Yellow Cab Co.,* 35 F.R.D. 159, 161 (E.D.Pa.1964) (original complaint alleged cab driver was negligent in not helping passenger get in and out of taxi; amended complaint alleged the driver negligently started the taxi while the passenger's foot was out of the car); *Chamberlin v. United Engineers & Constructors, Inc.,* 194 F.Supp. 647, 649 (E.D. Pa.1961) (amendment permitted to allege accident occurred because of crew leader's personal hatred of injured worker, not just leader's drunkenness).

**16.** There was a three-day trial on the possession issue with extensive cross-examination. The testimony of all the principals to the transaction was taken, and it is hard to imagine what other witnesses could have been called. The transcript reveals a thorough inquiry into the possession issue.

**17.** The Vickaryouses argued that they had always interpreted the agreement between themselves and Wright as a month-to-month tenancy. They argued that the wording of the earlier affidavit resulted from the Vickaryouses' lawyer drawing up the affidavit and initial complaint by phone.

**18.** Alaska Civil Rule 8(e) provides in part:

> A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both.

We note that the trial court permitted vigorous argument by Wright that the earlier pleading and Vickaryous's supporting affidavit established a five-year lease rather than a month-to-month one.

**19.** Wright points to AS 09.45.690 which provides in part:

> If, at any time before judgment, the lessee or his successor in interest pays the amount of rent in arrears with interest and costs of the action and performs the other covenants or agreements, he is entitled to continue in possession unless otherwise provided in the lease.

Thus, if Wright had a five-year lease, and his rental payments were up to date, the plaintiffs would have had no claim for relief. If, however, Wright had only a month-to-month lease, the Vickaryouses could give him notice that he had to vacate, notwithstanding his payment of rent for the past months. A month-to-month tenancy may be terminated by a written notice given at least 30 days before the rental due date specified in the notice. AS 34.03.290(b).

A plaintiff is not precluded from amending a faulty complaint so that it states a claim upon which relief can be granted simply because by so amending, the defendant may thereby be subsequently made liable to the plaintiff.

## II. FINDING OF A MONTH–TO–MONTH TENANCY

The trial court heard testimony taking up three volumes of transcript about the parties' intentions regarding the Interim Lease Agreement. It considered the original complaint and the supporting affidavit, along with all the other evidence. The trial court found that too many details were left undecided for the agreement to be a long-term lease, including the crucial issue of responsibility for repairs and improvements of the property.[20] The trial court found that the Interim Lease Agreement embodied a month-to-month tenancy and that the parties merely agreed to negotiate a long-term lease.[21]

 Wright argues that the trial court's findings are unsupported as a matter of law. In reviewing the trial court's interpretation of a contract, we view the facts most favorably to the party that prevailed below. *E. g., Jackson v. White,* 556 P.2d 530, 533 (Alaska 1976). Our task is to determine if the facts, so construed, support the trial court's interpretation of the lease agreement between Wright and the Vickaryouses. We believe that the trial court's construction was sound.

 A contract is interpreted to give effect to the reasonable expectations of the parties. *Wessells v. State,* 562 P.2d 1042, 1048 (Alaska 1977); *Day v. A & G Construction Co.,* 528 P.2d 440, 443–46 (Alaska 1974). As we stated in *Stordahl v. Government Employees Insurance Co.,* 564 P.2d 63 (Alaska 1977), in the context of an insurance contract:

> To ascertain the reasonable expectations of the parties, we look to the language of the disputed policy provisions, the language of other provisions of the insurance policy, and to relevant extrinsic evidence. In addition, we refer to case law interpreting similar provisions.

*Id.* at 66 (footnote omitted).[22]

 We believe the trial court's construction of the agreement between the Vickaryouses and Wright as a month-to-month lease was sound. The language of the lease agreement is strong support for this conclusion. It provides for monthly rental payments of $1,500.00.

20. The trial court stated:
 > Once the agreement is not in its entirety, then you cannot have a lease, you have no meeting of the minds. . . . I find a basic agreement to negotiate a lease with the essential items left for future negotiation, which have never taken place. . . . [I find] as a matter of law, that there is no lease document. Too many things were left undecided; the very fact that the proffered lease document, when offered, was not signed convinced me of that.
 >
 > So the question as to improvements, the amount of increase of the rent to cover the amortization of the improvements, the acceptance of all the items, the testimony, even, of Mr. Wright that there was [sic] other things to be determined, as I say, indicate as a matter of law that there was no lease.

21. Vickaryous testified that the phrase in the agreement "James and Catherine Vickaryous wish to lease to Sande Wright (Cottonwood Dairy) for five years" referred to their future desire to enter into and sign a lease.

22. Extrinsic evidence refers to evidence other than the language of the contract that bears on the parties' intentions. Sometimes this court has stated or implied that resort to extrinsic evidence can occur only after a preliminary finding of ambiguity. *See Tsakres v. Owens,* 561 P.2d 1218, 1221–22 (Alaska 1977); *Wessells v. State,* 562 P.2d 1042, 1046 (Alaska 1976); *Hendricks v. Knik Supply, Inc.,* 522 P.2d 543, 546 (Alaska 1974). So, theoretically, a court would examine extrinsic evidence to make a preliminary finding of ambiguity, and only after such a finding, would the court consider extrinsic evidence in construing the contract. This court has moved away from the cumbersome two-step process, *see Stordahl v. Gov't Employees Ins. Co.,* 564 P.2d at 66; *Tsakres v. Owens,* 561 P.2d at 1223 (Boochever, C. J., concurring); and that, according to Corbin, is the better approach. 3 A. Corbin, Contracts § 536, at 25–30 (1960).

until a permanent lease agreement acceptable to both parties can be drawn up. The monthly rental of $1,500.00 shall be continued after the second month has elapsed as per the lease agreement to be implemented.

Both parties agree that there is a basic understanding of what the lease agreement shall contain . . . .

The failure of the lease to address repairs and improvements was a crucial defect because, according to both parties, Cottonwood Dairy generally needed repairs and needed specific changes to be suitable for Wright's herd. As Vickaryous testified, the situation was rather complicated, and the Vickaryouses' financial position made approval of the lease by their creditors a must. This would require a formal lease drawn by an attorney, not something quickly typed up one evening by Jim Vickaryous. Also relevant is the parties' conduct after they had signed the Interim Lease Agreement. Jim Vickaryous hired a lawyer and paid him approximately $5,000.00 for negotiations with Wright for a long-term lease. Thus, the language of the instrument and the surrounding circumstances indicate a temporary agreement, to be replaced by a long term one. The parties could not have reasonably expected that the document entitled "Interim Lease Agreement" represented a five-year lease.

Wright cites authority that the mere fact that future negotiations are contemplated does not preclude a present formation of a lease. While the fact that future negotiations are contemplated may not negate the present forming of a lease, it certainly does not require a finding that a lease was formed. There is no indication that the trial court made an erroneous assumption that contemplation of future negotiations, per se, prevented establishment of a binding five-year lease.

Wright asserts that the court excluded evidence because of the parol evidence rule but cites no instances in the record where the court did this. Finally, Wright cites *Klinger v. Peterson,* 486 P.2d 373 (Alaska 1971), for the proposition that the Vickaryouses could not terminate a lease interest by notice. We stated in *Klinger:*

> In Alaska, absent a special agreement of the parties, a leasehold interest in land can be terminated *prematurely* only by judicial decree in a statutory action.

486 P.2d at 378 (emphasis added). If the agreement was a month-to-month lease, Wright's termination was not premature.[23] Since the Vickaryouses properly terminated Wright's lease by notice, the trial court correctly found that Wright was unlawfully holding over after the notice. AS 09.45.090.

### III. AWARD OF HAY CROPS

Wright cut a sizable amount of hay from Cottonwood Dairy and stored it on a neighbor's farm around the time of the trial on the possession issue. The trial court awarded the hay to the Vickaryouses at the end of this first part of the trial.[24]

Wright argues that even assuming he was a holdover tenant, the Vickaryouses were not entitled to the hay. The Vickaryouses argue that Wright failed to raise the point below, and that the hay crops were properly awarded to them.

---

23. A basic property primer states:

 A periodic estate is a tenancy which will continue for a year or a fraction of a year and for successive similar periods unless terminated by either party by proper notice. There are various kinds of periodic tenancies but the most common are those from year to year and month to month.

 C. Moynihan, Introduction to the Law of Real Property 79–80 (1962) (footnote omitted). Wright's interpretation of *Klinger* means parties could never form a month-to-month lease, something that decision clearly does not stand for.

24. Vickaryous apparently removed approximately 695 bales, but Wright interrupted Vickaryous and stopped him from removing any more. After a second hearing for another preliminary injunction on September 22 and October 7, 1976, the court permitted Vickaryous to remove 410 additional bales, thus making Vickaryouses' total 1,100 bales. Jim Vickaryous's estimate of the amount of hay Wright had cut ranged from 2,000 to 4,000 bales. Wright's estimates ranged from 524 to 1,151 to 1,500 bales. The trial court never made an estimate on the record of how many bales were obtained by Vickaryous.

Wright did forcefully argue that the Vickaryouses were getting a windfall, in part because of the fertilizer he had used in planting the hay. In response to that argument, the trial court awarded Wright an offset for the fertilizer. But the Vickaryouses are correct that Wright never squarely raised the hay crop issue before the trial court. The record suggests that Wright assumed, along with the trial court, that the decision on possession of the land also determined who was entitled to the hay.

▇▇▇▇ This court, however, may notice a claim not raised below to prevent a miscarriage of justice. *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 90 (Alaska 1974). The clear weight of case authority supports Wright's position that a holdover tenant is entitled to crops as against the owner.[25] The reason is that the owner's remedy is the reasonable rental value of the property. An owner who receives rent *and* the crops from the land is receiving double recovery.[26] One court stated:

> But the risk assumed [by the holdover tenant] was not the loss of crops harvested, but that of responding in damages for the rental value of the use and occupation. For breach of a tenant's covenant to surrender possession at the expiration of the term, the landlord may recover the rental value of the premises during the time the possession is wrongfully withheld by the tenant. . . .
>
> The owners having this complete remedy for the recovery of their damages, should they also have an additional right to bring an action for the value of the crops produced and sold or consumed by the tenant? This question brings us to the crux of this lawsuit.
>
> There seems to be ample authority for the proposition that one who sows and harvests a crop upon the land of another is entitled to the crop as against the owner of the land, whether he came into possession of the land lawfully or not, provided he remains in possession until the crop is harvested.

*Smith v. Dairymen's League Co-op Ass'n,* 186 Misc. 82, 58 N.Y.S.2d 376, 380 (1948) (citations omitted).[27] Vickaryouses' dam-

---

25. *First Nat. Bank v. Federal Land Bank,* 225 Ala. 387, 143 So. 567 (1932); *Rector v. Lewis,* 46 Cal.App. 168, 188 P. 1018 (1920); *Smith v. Dairymen's League Co-op Ass'n,* 186 Misc. 82, 58 N.Y.S.2d 376 (1945); *Smith v. Hungerford,* 270 App.Div. 1071, 63 N.Y.S.2d 691 (App.Div. 1946) (per curiam); 51C C.J.S. Landlord and Tenant § 348 (1968). *See Benhart v. Gorham,* 14 Wash.App. 723, 544 P.2d 141, 143 (1976) ("As between lessor and lessee, it is the general rule in Washington that title to the crops follows actual possession of the land").

*But see Mehl v. Horton,* 201 Minn. 203, 275 N.W. 843, 844–45 (1937). The Vickaryouses argue that AS 09.45.496(b) implies that Wright has no right to crops planted after he received notice to quit. That statute provides, in part:

> The tenant shall have free access to the premises to cultivate and harvest crops or produce planted by him before the service of the notice of the breach and demand to quit the premises.

AS 09.45.496(b) is irrelevant to this case. It describes the legal obligation of an owner who has regained possession of land after a notice to quit; the owner must grant access to the tenant to harvest crops planted before the notice. It does not describe or imply who has legal right to crops planted and, in this case harvested, when the tenant-defendant was in possession of the land and has paid rental damages for the period of unlawful possession.

26. The rule is just, particularly if one considers that the holdover tenants generally believe that they have a legal right to possession of the land. The trial judge did not find Wright held over in bad faith and viewed the dispute as one where each side sincerely felt it was in the right. A different rule regarding the right to crops may apply to a tenant acting in bad faith. *See Rector v. Lewis,* 188 P. at 1019.

27. The holdover tenant is only entitled, however, to certain kinds of crops, usually categorized as fructus industriales (but not fructus naturales), *Webb v. Arrington,* 249 Md. 46, 238 A.2d 243, 245 (1968). Wright's reply brief provides a complete answer to Vickaryouses' contention that the hay was a fructus naturales:

> Little need be said with regard to the theory that haycrops are fructus naturales. In Alaska at least and in the circumstances disclosed by the records, the haycrops could not be produced by the powers of nature alone. If that were so, most of the dispute at bar could not even have arisen. The haycrops are annual crops that are obtained by yearly labor and cultivation and are therefore fructus industriales. They are crops that require

ages included rental value for Cottonwood Dairy in addition to the award of the harvested hay crops. Thus, the Vickaryouses received double compensation.

■ In view of the substantial value of the hay, the clearcut legal proposition which entitled Wright to possession of the hay, the injustice of requiring Wright to compensate doubly the Vickaryouses, and Wright's raising of the related fertilizer claim, we find plain error in the trial court's award of the hay crops. On remand, the trial court shall reduce the Vickaryouses' damage award by the value of the hay crops.

## IV. SPECIFIC ITEMS OF DAMAGES

■ On many issues, Wright said one thing and Vickaryous another. The trial court had the opportunity to view the witnesses and evaluate their credibility. *E. g., Associated Engineers & Contractors, Inc. v. H & W Construction Co.,* 438 P.2d 224, 227–28 (Alaska 1968). This court will not set aside a finding by the trial court unless it is clearly erroneous. *E. g., Jackson v. White,* 556 P.2d 530, 532–33 (Alaska 1976); Alaska R.Civ.P. 52(a).[28]

Wright's brief alleges that the trial court's awards of three specific items of damages were in error. First, Wright, in a highly conclusory fashion, claims the award of damages for the Vickaryouses' inability to plant a second hay crop[29] was error:

Sande was incredibly charged with alleged loss of profits with regard to a second cutting. If anything the evidence shows that the matter is entirely speculative. Moreover the testimony also indicates that there was absolutely no time for a second fertilizing. [record citation omitted]

a periodical planting like corn. It appears from these authorities that crops raised by yearly manurance and labor owe their annual existence to cultivation by man, and cannot conceivably be considered as products by power of nature alone. [citation omitted]

28. Alaska R.Civ.P. 52(a) provides in part:
Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be

■ The general rule on lost profits from a tenant's unlawful holding over is as follows:

In a proper case, lost profits directly resulting from the detention of the premises have been held recoverable, but such loss must be proved with reasonable exactitude. In other words, there must be some basis for computing the loss resulting, such factors as the length of time the business has been conducted on the premises, the nature of the business, and the experience of the parties involved, having been considered by the courts in allowing or disallowing such damages.

Annot., 32 A.L.R.2d 582, 586 (1953) (footnote omitted).

■ Vickaryous testified about the characteristics of his land and its possible yield per acre; he testified that he could have obtained a second cutting of hay from the Cottonwood Dairy Farm and in the past had secured such cuttings. Wright testified that he had done all that was possible to get a second yield. It is true that Vickaryous said that in some previous years the land had not yielded a second cutting, but he said that was because he had not been there to supervise the field work. This was sufficient evidence for the trial court to conclude that the Vickaryouses suffered lost profits from Wright's holding over.

Second, Wright alleges that he returned the silo in better shape than when he received it and that the alleged defects in his repair work were only to make the silo workable. Not surprisingly, the Vickaryouses claimed the repairs were not done with ordinary care and left the system useless. The trial court found that the Vickaryouses had suffered $5,800.00 in damages from Wright's silo repair work.

given to the opportunity of the trial court to judge of the credibility of the witnesses.

29. Plaintiffs regained the Cottonwood Dairy Farm sometime in July. They alleged that by that time, a second planting was impossible, causing them a loss of two tons of hay per acre or $38,000.00. The trial court concluded that the Vickaryouses lost 1¼ to 1½ tons per acre, or $25,000.00.

■ The general rule regarding a tenant's liability for damages is as follows:

[I]t is the duty of the tenant to exercise ordinary care, in the use of the leased premises or property, not to cause any material and permanent injury thereto over and above the ordinary wear and tear, and that he is liable to the landlord in damages for any such injury unnecessarily resulting from his wrongful acts or his failure to exercise such care.

Annot., 10 A.L.R.2d 1012, 1014 (1950). Whether Wright's work helped the silo or damaged it in the amount of $5,800.00 is a question of fact dependent upon evaluating the credibility of the witnesses. The trial court's finding has sufficient support in the record.

■ Third, the trial court awarded the Vickaryouses approximately $5,000.00 in attorney's fees expended from May to December (mostly during October and November) in efforts to negotiate a lease. Wright is correct that as a matter of law, the record does not support this award. The Vickaryouses paid the attorney's fees *before* they terminated Wright's month-to-month tenancy in December and therefore *before* the unlawful holding over occurred.[30] Wright's unlawful possession of Cottonwood Dairy cannot have caused the Vickaryouses to spend money if they spent it before Wright's possession became unlawful.

■ The Vickaryouses argue that Wright would be liable for all damages reasonably foreseeable from a breach of contract, and that the Vickaryouses' legal fees were reasonably foreseeable from an agreement to agree. Assuming the trial court found that the parties made an agreement to agree,[31] and assuming Wright would be liable for damages if he breached that agreement,[32] the record does not indicate that Wright breached such an agreement.[33]

## V. APPLICATION OF THE COLLATERAL SOURCE RULE

The trial court held that Wright was liable to the Vickaryouses for $22,000.00 damage to the Cottonwood Dairy barn caused by fire,[34] and that Wright's liability was not reduced by the amount of the loss covered by fire insurance. This ruling was based on the collateral source doctrine, which, "as applied in Alaska, prohibits a tort-feasor from benefiting from payments made to the injured party by insurance companies or other third parties." *Aydlett v. Haynes*, 511 P.2d 1311, 1313 (Alaska 1973) (footnote omitted), citing, *inter alia, Restatement of Torts*, § 920(e) (1939). Wright argued that the trial court erred in applying this doctrine because he contributed to the insurance premiums, and hence the payment by the insurance company was not collateral, but "derivative." *Aydlett v. Haynes*, 511 P.2d at 1313–14. The Vickaryouses deny any such contribution, and further assert that the fact that they, not Wright, were named beneficiaries of the fire insurance policy forecloses Wright's attack on the collateral source rule.

■ The trial court believed this issue was governed by *Baugh-Belarde Construction Co. v. College Utilities Corp.*, 561 P.2d 1211 (Alaska 1977). That case stands for

---

**30.** In fact, Vickaryous testified that Wright's refusal to sign the lease caused him to give Wright notice.

**31.** The trial court at the end of the second day of trial indicated that he believed the parties had made an agreement to form a lease, but the court's formal findings did not include that finding.

**32.** *But see Western Airlines, Inc. v. Lathrop Co.*, 499 P.2d 1013, 1019–20 (Alaska 1972).

**33.** The mere fact that the parties did not arrive at a lease does not mean that Wright breached any agreement to agree. Vickaryous testified to what probably amounts to a breach by Wright, but we do not know whether the trial court drew that legal or factual conclusion. The final order lists the negotiation fees as *damages from the unlawful holding over.*

**34.** The trial court found that the fire was caused by the negligence of Wright's employees or their children, thereby making Wright vicariously liable. The fire was caused by children smoking in the barn. Wright's challenge to this finding is far too conclusory to place this issue before us.

the proposition that a named insured may not be sued by its insurer. It does not imply that a person not named in an insurance policy can never claim any benefits from it, even when that person contributed to procuring the policy. Such a position would be contrary to common sense and to the policy behind the collateral source doctrine, namely, that a tort-feasor should not be able to escape liability because the victim was "fortunate enough to have received compensation for his injuries or expenses from a collateral source." *Ridgeway v. North Star Terminal & Stevedoring Co.*, 378 P.2d 647, 650 (Alaska 1963) (footnote omitted). If the alleged tort-feasor has contributed to insurance premiums, it is hardly "fortune" that has supplied the collateral payments.

■ A schedule of Wright's rental payments, drawn up by Vickaryous, unequivocally earmarks a specific part of rent for insurance premiums.[35] We therefore remand so that the award for fire-related damages may be reduced by the amount that the Vickaryouses collected in fire insurance.

## VI. THE OFFSET

■ The trial court offset the Vickaryouses' damages by approximately $20,-000.00. The trial court found this amount was "a recovery of extraordinary expenses incurred during his tenancy; or made with tacit approval of the plaintiff."[36] The trial court discounted some expenses, above this amount, which Wright claimed.

There was sufficient evidence in the record for the trial court's finding, despite the fact that Vickaryous testified that Wright did not improve Cottonwood Dairy and that the Vickaryouses did not tacitly approve any repairs. Also, the Vickaryouses' cross-appeal assumes that Wright held over in

---

**35.** We do not decide whether a specific earmarking of rent for insurance, as is present here, is necessary to a tenant's claim that an owner's insurance recovery should decrease a tenant's damage liability.

**36.** The Vickaryouses cite largely irrelevant authority. They either say a person cannot have

bad faith, a finding never made by the trial court.

■ The offset, however, included money Wright spent on fertilizer for hay crops. Since we have awarded Wright the monetary value of the hay crop, any item expended to produce it should be eliminated from the offset.[37] Otherwise, Wright would receive both the hay and his expenses in growing the hay.

AFFIRMED in part, RESERVED in part, and REMANDED for further proceedings consistent with this opinion.

CONNOR, J., not participating.

### APPENDIX A

### JIM AND CATHIE VICKARYOUS

Star Route A Box 91

Palmer, Alaska 99645

May 19, 1975

*INTERIM LEASE AGREEMENT*

James and Catherine Vickaryous wish to lease to Sande Wright for five years certain acreages and improvements totaling about 360 acres known as "Cottonwood Dairy" located in Sections 6, 8, and 5 T17N, R1E, SM near Wasilla, Alaska.

Sande Wright took possession of said leased properties on May 19, 1975. He has agreed to pay $3,000.00 which shall represent the first two months rent before ten (10) days have elapsed from May 19, 1975. Thereafter, monthly rental payments of $1,500.00 shall be made until a permanent lease agreement acceptable to both parties can be drawn up. The monthly rental of $1,500.00 shall be continued after the second month has elapsed as per the lease agreement to be implemented.

---

benefits forced upon him, or that a person should not have to pay for something that was not really a benefit.

**37.** The offset included $12,042.00 for fertilizer which, the record suggests, was used only for the hay crops.

503

Both parties agree that there is a basic understanding of what the lease agreement shall contain, and this understanding is represented by the notes and other information given to Mr. Doug Jacobson at a meeting with him on Sunday May 18, 1975.

/s/ James Vickaryous

/s/ Catherine Vickaryous

/s/ Sande Wright