Jeanette JAMES, Jed T. Williams, and
Sheila J. Williams, Appellants,

v.

STATE of Alaska, Appellee.

No. S–3515.

Supreme Court of Alaska.

July 19, 1991.

Thomas R. Wickwire, Fairbanks, for appellants.

Cameron M. Leonard, Asst. Atty. Gen., Fairbanks and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

### I. FACTS AND PROCEEDINGS

This is an appeal from a grant of summary judgment. Accordingly, the facts are presented in the light most favorable to appellants.[1]

In 1980, the Alaska Department of Natural Resources (DNR) conducted the Potlatch Ponds land lottery.[2] However, the legality of the lottery was challenged and, after a timely appeal, we held the lottery invalid. *State v. Weidner*, 684 P.2d 103 (1984).[3] Lottery proceedings continued during the appellate process, but no conveyances were permitted until the case was concluded.

Beginning in 1982, during the pendency of *Weidner*, the DNR began investigating possible means of curing the embroiled lottery. One alternative was a reoffer. In 1982, Jerry Brossia, head of the Fairbanks office of the DNR, drafted a "John Doe" letter indicating the state's intention to conduct a reoffer.[4] Brossia's letter stated in part,

> If the reevaluation process results in a reoffer of [the] Potlatch Ponds disposal, it is the State's intention to offer a preference right to the original Potlatch Ponds "winners" in accordance with AS 38.05.035(b)(2). The preference right will entitle the Potlatch Pond "winner" to purchase the parcel he was originally drawn for in lottery #3. This statute allows the Director of the Division of Land and Water Management to grant a preference right to a designated parcel of state land to an individual who has been done an inequity [by] the errors or omissions of a state or federal agency....

Although we will continue to appeal [the superior court's] ruling, in order to avoid a similar challenge to a new offering of Potlatch Ponds, we will have to avoid the "errors" which [the superior court] found with the original disposal. As a result,

---

1. On appeal from a grant of summary judgment, we must decide whether there is a genuine issue of material fact and whether the moving party is entitled to judgment on the established facts. *See, e.g., Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 116 (Alaska 1990); *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the non-moving party. *Walt v. State*, 751 P.2d 1345, 1348 n. 2 (Alaska 1988).

2. Essentially, lottery winners were to be given the opportunity to purchase agricultural rights to parcels located in the Potlatch Ponds area, 15 miles Northeast of Fairbanks on Chena Hot Springs Road, at a price of $100.00 per acre less residency discounts of 5% per year of residency, up to a maximum of the lesser of 50% or $25,-000.

3. We invalidated the lottery for noncompliance with a local subdivision ordinance requiring borough approval of local subdivision sales. *See State v. Weidner*, 684 P.2d 103, 110–11 (Alaska 1984).

4. Brossia's letter appears never to have been released publicly prior to the institution of this litigation.

some changes may be made; we hope the changes will be minor. Of course, if a particular parcel is eliminated in the reoffering, we would grant the winner of that parcel the option of a preference right to a comparable parcel elsewhere, or that person may choose to decline a preference right in the hope that the Supreme Court decides [*Weidner*] in favor of the original disposal.

In April 1982, Dick LeFebvre, a deputy director at DNR, wrote directly to Potlatch Ponds lottery winners and notified them of the state's intentions relating to the reoffer. LeFebvre's letter indicated that the reoffer was still in the "planning process," and that "previous winners whose parcels are determined in the process to be best suited for agricultural disposal and who have not relinquished their parcel, will be eligible for consideration for a preference right to purchase the parcel they would have otherwise obtained had the [*Weidner*] suit not been filed." The letter further stated,

> If the land is determined unsuitable in a parcel previously awarded it will not be available in the new offering but if the individual has not previously relinquished the parcel, the individual will be granted a preference right to another parcel from the lands available for disposal within the management plan....

The letter also notified lottery participants of an upcoming meeting to discuss topics raised in the letter.

Thereafter, several public meetings were held in which DNR officials discussed the proposed reoffer with Potlatch Ponds winners. At the first of these meetings, with Jeanette James and "Bud" Williams (Jed Williams' father) in attendance, Bob Cannon, a DNR official, "indicated preference rights would [be] given to parcel 'winners' in the new lottery [but that these] (must be applied for and approved by the Commissioner of DNR)...." LeFebvre added that "to be eligible for a preference right the 'winner' must first relinquish any previous rights." [5] Three subsequent meetings be-

tween the public and DNR officials were held in 1982. At these meetings the DNR again stated that a possible resolution would allow Potlatch Ponds lottery winners to apply for a preference right "to purchase that land again," but "that preference right will have to be okayed by first the director of ... Land and Water Managment and secondly by the Commissioner of Natural Resources."

In 1985, Division of Land and Water Management Director Hawkins wrote a letter to Potlatch Ponds winners confirming the DNR's commitment to the plans outlined in the Brossia document and the LeFebvre letter. Hawkins' letter stated, in part, as follows:

> *Requested Action:* To hereby grant preference rights to all people whose names were drawn in the 1980 lottery for Potlatch Ponds parcels and, as of the date of this decision, have not relinquished their parcel[s].
>
> *Legal Authority:* A.S. 38.05.035(b)(2) requires that this decision demonstrate that an error or omission occurred, resulting in inequitable detriment, and that the claimant was diligent and had no control over the situation.
>
> ....
>
> *Decision:* ... [I]t is my decision to allow each individual Potlatch Ponds parcel winner, who had not already relinquished a claim to a parcel, the right to apply for a preference right of purchase for the agricultural interests to the Potlatch Ponds parcel each originally claimed, or another parcel of similar size or value, pursuant to AS 38.05.035(b)(2).

In March of 1987, Commissioner Brady acted on the matter, issuing a memorandum decision which stated in part:

> *Decision:* ... 2. The following procedures will be used to implement the Director's Decision dated 5/24/85:
>
> a. Each individual Potlatch Ponds parcel winner who had not already relinquished a claim to a parcel, may apply for a preference right for purchase of one parcel of state land of any

---

**5.** This text of what was said at the meeting is taken from handwritten "meeting Notes," which purport to record the minutes of the DNR meeting.

size or value from a selection pool ... available from state land parcels ..., or each individual may apply for the agricultural rights to the Potlatch Ponds parcel each originally claimed....

....

c. To establish a selection priority a lottery drawing will be held....

d. Applicants will be required to sign a notarized form relinquishing any interest they may hold in their Potlatch Ponds parcel and a release of liability to any present or future claims arising as a result of the 1980 Potlatch Ponds Lottery.

In May 1987, DNR held. a lottery to determine the order in which previous Potlatch Ponds "winners" could apply for a preference right. Several of the previous winners, including appellants, chose not to participate.

Appellants[6] sued the state in superior court, ultimately relying on a theory of promissory estoppel.[7] Their fundamental contention was that Hawkins' 1985 letter granted or promised to grant them preference rights to their original or comparable parcels. Appellants argued that the Commissioner's decision, which they viewed as only granting the right to apply for a pref-

erence right in a new lottery not involving comparable parcels, was an inadequate substitute for the parcels of similar size and value promised by Hawkins, and that their reliance on the Director's promise supported a claim based on a theory of promissory estoppel. The state moved for summary judgment arguing, *inter alia*, that there had been no promise of a grant of preference rights to parcels comparable to those offered originally; rather, that only a right to apply for preference rights was promised by Director Hawkins' decision.

The superior court granted the state's motion for summary judgment, rejecting appellants' promissory estoppel claim on the grounds that there was no issue of material fact as to detrimental reliance and that certain alleged reliance damages were legally inadequate for purposes of establishing promissory estoppel.[8] We affirm.

## II. SUMMARY JUDGMENT AS TO PROMISSORY ESTOPPEL

Appellants argue that they reasonably relied upon promises made by representatives of the state to the effect that they would receive either their original or comparable parcels.[9] Promissory estoppel is

---

**6.** Although appellants' claims were consolidated in the superior court with those of other lottery participants, only the claims of Jeanette James, Jed Williams, and Sheila Williams are appealed.

**7.** Appellants' initial complaint in superior court included a negligence claim which has been abandoned for purposes of this appeal.

**8.** Jeanette James sought damages for time spent preparing the action. Jed and Sheila Williams sought damages for monies spent in reliance upon the state's alleged promises. With respect to the Williams' claims, the superior court ruled that since "[t]he opposition to the State's motion ... for summary judgment raises no factual issues[,] ... [t]he materials documented by the State as to the nature of the promise, the records of the earlier meetings, [and] the terms of the offer, stand unchallenged." The superior court held that all that was promised to these land lottery participants was the opportunity to apply for a preference right, which had been provided in the Commissioner's memorandum decision. With respect to James, the superior court found that "James incurred no expense, and bases her entire claim upon her service [to] civic organizations." Thus, the court ruled that

"[t]he timing and the stated reliance [are] factually inadequate; the actions are legally inadequate, as a matter of law."

**9.** Both parties cite precedents discussing not only promissory estoppel but also the related doctrine of equitable estoppel. The primary difference between promissory and equitable estoppels is that the former is offensive, and can be used for affirmative enforcement of a promise, whereas the latter is defensive, and can be used only for preventing the opposing party from raising a particular claim or defense. *See Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 380 n. 7 (Alaska 1984). Despite this important difference, relevant analogies can be drawn between the two doctrines, since equitable estoppel involves proof of elements similar to the elements of a promissory estoppel claim. *Compare Messerli v. Department of Natural Resources*, 768 P.2d 1112, 1121 (Alaska 1989), *overruled on other grounds, Olson v. State, Dep't of Natural Resources*, 799 P.2d 289 (Alaska 1990) *with Zeman*, 699 P.2d at 1284. It is undisputed that the primary thrust of appellants' claim is offensive rather than defensive, for they seek enforcement of alleged promises by the state.

recognized in Alaska. *See, e.g., Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1284 (Alaska 1985).[10] In *Zeman,* we identified the following four elements of the promissory estoppel cause of action:

1) The action induced amounts to a substantial change of position;

2) it was either actually foreseen or reasonably foreseeable by the promisor;

3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

4) enforcement is necessary in the interest of justice.

*Id.* at 1284 (citing *State v. First Nat'l Bank of Ketchikan,* 629 P.2d 78, 81 (Alaska 1981); 1A A. Corbin, *Corbin on Contracts* § 200 at 215–21 (1963)); *see also Glover v. Sager,* 667 P.2d 1198, 1202 (Alaska 1983); *Slaymaker v. Peterkin,* 518 P.2d 763, 766 (Alaska 1974).

In rejecting appellants' promissory estoppel claim, the superior court ruled that "the stated reliance is factually inadequate; the actions are legally inadequate as a matter of law." The superior court further stated that "the opposition to the State's motion ... for summary judgment raises no factual issues."

More specifically, the superior court granted summary judgment against appellants' promissory estoppel claim on the ground that there was no genuine issue of material fact as to the existence of an unsatisfied promise supporting the alleged reliance. Thus, we must determine whether, viewing the facts in the light most favorable to appellants, there is a genuine issue of material fact as to whether the evidence discloses an actual promise inducing reliance for promissory estoppel purposes. *Zeman,* 699 P.2d at 1284.

(A) Can Brossia's letter constitute a basis for asserting promisory estoppel against the state?

■ Before the superior court, appellants contended that the state made its first promise to them in 1985, when Director Hawkins announced his decision. Although this contention expressly waived reliance upon any earlier "promises" in the superior court, appellants now argue that the 1982 letter drafted by Jerry Brossia constituted a separate and earlier promise that the participants would receive "comparable" parcels. We reject this argument for two reasons. First, appellants expressly waived it in open court. Second, the argument that appellants relied upon the Brossia letter is without support in the record.

Brossia's letter cannot be considered a promise because it was not sent to anyone. The letter was addressed to "John Doe" and was apparently a preliminary draft of the subsequent letter issued by Deputy Director Dick LeFebvre, which *was* sent directly to Potlatch lottery participants. There is, however, no indication in the record that any Potlatch Ponds lottery winner ever saw Brossia's letter. Instead, the state introduced the draft letter as an exhibit attached to its memorandum in support of its motion for summary judgment, as evidence of the state's intention as of 1982 to plan and conduct a reoffer. Despite appellants' claim that "the state as-

---

**10.** We have arguably recognized the availability of promissory estoppel against a governmental entity. *See State v. First Nat'l Bank of Ketchikan,* 629 P.2d 78, 80–81 (Alaska 1981) (reversing summary judgment against government on promissory estoppel theory because cited promise was in fact kept). The state points out that several federal courts have questioned the applicability of the promissory estoppel doctrine against the federal government. *See Jablon v. United States,* 657 F.2d 1064, 1069–70 (9th Cir. 1981) ("We have not discovered, and the parties have not cited, any precedent in this circuit for an independent cause of action against the government founded upon promissory estoppel.") However, as the court in *Jablon* ob-

served, there is at most a division among the circuits as to the viability of promissory estoppel against the federal government, not a firm rule against such suits. *Id.* at 1069 n. 9. Several circuit courts have suggested the availability of this theory. *See, e.g., Robbins v. Reagan,* 780 F.2d 37, 53 (D.C.Cir.1985) (elements of promissory estoppel claim against government not sufficiently established to warrant remand); *Reamer v. United States,* 532 F.2d 349 (4th Cir.1976) (rejecting particular application, but not availability of theory of promissory estoppel); *Kaye v. United States,* 467 F.2d 415, 418–19 (D.C.Cir. 1972) (remanding to permit trial on promissory estoppel theory).

serted [in its memorandum in support of its motion for summary judgment] that this letter advised the lottery winners of its plan to conduct a reoffer," the state did not in fact cite Brossia's letter for that purpose, but only to show that internal state planning mechanisms were in motion in 1982. In short, because there is no indication that any of these appellants ever saw Brossia's letter, and because appellants expressly declined reliance on the letter in the superior court, we do not view the Brossia draft "John Doe" letter as a source of appellants' reliance. Rather, like the superior court, we analyze appellants' promissory estoppel claim as grounded in reliance on Hawkins' 1985 letter.

**(B) Are the requirements of promissory estoppel satisfied?**

■ The essential portion of the 1985 letter from Director Hawkins, from which appellants distill a promise that they would receive preference rights to their original or comparable parcels, is as follows:

> *Requested Action:* To hereby grant preference rights to all people whose names were drawn in the 1980 lottery for Potlatch Ponds parcels and, as of the date of this decision, have not relinquished their parcel.... [I]t is my decision to allow each individual ... the right to apply for a preference right of purchase for the ... parcel each originally claimed, or another parcel of similar size or value, pursuant to AS 38.05.035(b)(2).

Appellants contend that the quoted text constituted a "present grant" of preference rights, or at least induced their reasonable reliance on the promise that they would eventually receive their original or similar parcels. In response, the state argues that Director Hawkins' letter could not, as a matter of law, constitute a present grant of a preference right, and the appellants' promissory estoppel claim predicated on the letter is, as the superior court ruled, legally insufficient.

In our view, the superior court ruled correctly. Appellants' promissory estoppel claim must fail for several reasons. Director Hawkins' letter cannot fairly be read as containing a promise that appellants would receive their original or similar parcels. Instead, it promised that a reoffer would be held and that, after relinquishment, participants could apply for a preference right. The state has kept that promise. Moreover, since Hawkins' letter referenced the statute which requires the Commissioner's approval as a prerequisite to a binding grant of a preference right, the state could not reasonably foresee appellants' reliance. *See Zeman,* 699 P.2d at 1284. Finally, in the factual context of this case, we are not persuaded that the interests of justice require that the state do more than it has for appellants.

**(i) Hawkins did not promise to grant preference rights.**

■ To make out a claim for promissory estoppel, one must show "that an actual promise was made." *Zeman,* 699 P.2d at 1284. Here, no promise of a grant of a preference right was made. The opening paragraph of the Director's letter states that the "requested action" is that the Director "hereby grant" preference rights; yet in the concluding paragraph only the right to apply for a preference right is promised.

A common sense reading of the letter indicates that a grant of preference rights was the action requested, not the action taken. The action taken was that Hawkins informed appellants that they could apply for a preference right. Moreover, Hawkins' letter could not, as a matter of law, grant preference rights to appellants. The statute referred to in the letter, AS 38.05.-035(b)(2), requires that the Commissioner expressly approve a Director's grant of a preference right before that right becomes valid. AS 38.05.035(b)(2)(A).[11] In short,

**11.** AS 38.05.035(b) provides that:
  The director may....
    (2) grant preference rights for the lease or purchase of state land without competitive bid in order to correct errors or omissions of a

state or federal administrative agency when inequitable detriment would otherwise result to a diligent claimant or applicant due to situations over which the claimant or applicant had no control; the exercise of this dis-

Hawkins lacked authorization on his own to grant preference rights. Therefore, since Hawkins' letter referenced the applicable statute, the letter was clear with respect to the status of the preference rights at issue: they would have to be approved by the Commissioner. In short, we conclude that Hawkins' letter did not grant or promise to grant preference rights to appellants.

(ii) The promises actually made by the state were kept.

■ The right to apply for a preference right was all that was ever promised by the state. As the superior court held, that promise was in fact fulfilled by the Commissioner's implementing letter.[12] Where the state's promises are kept, promissory estoppel principles do not justify imposition upon the state of a duty to do more than was promised. *See State v. First National Bank of Ketchikan*, 629 P.2d 78, 81–82 (Alaska 1981).

(iii) Appellants' reliance was not reasonably foreseeable by the state.

Because the Director's letter was sufficient to put appellants on notice that Hawkins was without authority to grant preference rights on the state's behalf, AS 38.05.-035(b)(2)(e), appellants' promissory estoppel claim is, in our view, legally insufficient on an additional ground. Appellants have not shown, as required by *Zeman*, that their reliance "was either actually foreseen or reasonably foreseeable by the promisor." *Zeman*, 699 P.2d at 1284.

■ In *Messerli v. Department of Natural Resources*, 768 P.2d 1112 (Alaska 1989), *overruled on other grounds, Olson v. State, Dep't of Natural Resources*, 799 P.2d 289 (Alaska 1990), we addressed a related issue, and concluded that certain plaintiffs seeking to employ an equitable estoppel theory could not have reasonably relied upon the Director's decision since he had not obtained the Commissioner's express approval:

> [W]e believe the court erred in finding reasonable reliance by Messerli on the Director's decision to expand the search area. The statute authorizing preference rights clearly states that the Director can only act with the Commissioner's express approval. AS 38.05.-035(b)(2). Former AS 38.05.035(a)(14) [now AS 38.05.035(e)] required the Commissioner's consent before the Director could dispose of state land. It is presumed that Messerli knew the law. *See State v. Alaska Land Title Ass'n*, 667 P.2d 714, 725 (Alaska 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 168 (1984). Additionally, Messerli was assisted by counsel and a land consultant.... Thus, Messerli's reliance on the Director's expansion of the search area was unreasonable. Because Messerli's reliance was unreasonable, he could not establish the elements of estoppel.

*Id.* at 1121. To make a case for equitable estoppel, it must be established that the claimant's reliance was reasonable. *See Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984). On the other hand, a promissory estoppel claimant need not establish that his or her reliance on the alleged promise was reasonable; instead, he or she must show that his or her reliance was either foreseen or reasonably foreseeable by the promisor. *Zeman*, 699 P.2d at 1284.

In the instant case, we need not reach the constructive notice point of *Messerli*. Here, the Director wrote to appellants and informed them that "it is my decision to allow each individual ... the right to apply

cretionary power operates only to divest the state of its title to or interest in land and may be exercised only
  (A) with the express approval of the commissioner....

12. The Commissioner's letter required relinquishment by appellants of their claims. That requirement was consistent with the state's prior promises, and is within the power of the DNR to impose. *See Messerli*, 768 P.2d at 1119–20. Moreover, the record does not support appellants' contention that the state promised them that the reoffer would consist of lands near Fairbanks. The state never promised appellants land in a particular location, and indeed, in 1982 alerted appellants that it might give them "land in another area."

for a preference right ... pursuant to AS 38.50.035(b)." He thus put appellants on actual notice that their ability to obtain a preference right was controlled by AS 38.-05.035(b). The state could reasonably presume that a lay person would either read the statute or consult an attorney to determine his or her rights.

We conclude that the state did not foresee, and would not reasonably have foreseen, that appellants would rely on Director Hawkins' letter. By citing the applicable law, the state, in our view, fulfilled any obligation it had to inform appellants of the true status of its promise. Since none of the appellants can establish that the state should reasonably have foreseen their reliance, and because there is no evidence in the record suggesting the state actually foresaw such reliance, we hold that appellants have failed to make out a legally sufficient claim based on the promissory estoppel theory. The state could not have foreseen appellants' reliance given the state of the law, the content of Director Hawkins' letter, and the context of the ongoing meetings concerning the lottery.[13]

## III. THE SUPERIOR COURT'S DENIAL OF APPELLANTS' MOTION TO AMEND THEIR COMPLAINT

■ Appellants also contend that the superior court erred by denying their second motion for leave to amend their complaint. The difference between the amended and proposed second amended complaints was that the original complaint named only Jed and Sheila Williams in their individual capacities, whereas the amended complaint would have named the "Williams' Farm Partnership."

The state opposed the motion. The state acknowledged that at its deposition of Jed Williams it had learned that "the whole family went into this deal together." Nevertheless, the state argued that it would be prejudiced were it required to prepare to defend against a partnership, rather than appellants in their individual capacities, at that late date in the proceedings.[14]

■ Leave to amend has traditionally been freely granted. *Betz v. Chena Hot Springs Group*, 742 P.2d 1346, 1348 (Alaska 1983); *Wright v. Vickaryous*, 598 P.2d 490, 495 (Alaska 1979). We review denials of leave to amend under an abuse of discretion standard. *Rutledge v. Alyeska Pipeline Serv. Co.*, 727 P.2d 1050, 1054 (Alaska 1986); *Shooshanian v. Wagner*, 672 P.2d 455, 458 (Alaska 1983); *Estate of Thompson v. Mercedes–Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973). The superior court's exercise of its discretion in such matters will be overturned only if we are left with a "definite and firm conviction" that the court erred. *Betz*, 742 P.2d at 1348.

Appellants argued that "[t]he new complaint would not ... raise any new questions of whether the other partners relied

13. We further conclude that there is an additional basis for sustaining the superior court's grant of summary judgment. Under *Zeman*, the court must be persuaded that the interests of justice require enforcement of the promise before finding promissory estoppel. *Zeman*, 699 P.2d at 1284. We have held in an analogous situation that because the state's promises were kept, the interests of justice cannot require further enforcement of appellants' purported understanding of those promises. *See State v. First Nat'l Bank of Ketchikan*, 629 P.2d 78, 81–82 (Alaska 1981). Here, as indicated above, we are not persuaded that the interests of justice require that appellants be granted their requested relief.

14. The opposition to the motion to amend reads in part,

> Whether or not the oral agreements and transactions within the Williams family cre-

ated a partnership is a new legal issue which the amended complaint would inject into this suit. (*See* AS 32.05.020.) The new complaint would also raise the question of whether the other "partners" relied upon any state representations in making their respective investments. Finally, it is not self-evident that one partner can recover losses suffered by other partners who are not parties to the suit. These are all new issues, which would further complicate the already complex litigation....

> Should the court allow the amendment, the state would be prejudiced by the need to conduct discovery regarding the alleged partnership, and to litigate its existence if appropriate.... Such a renewed discovery effort would distract undersigned counsel from necessary trial preparation, in the last few weeks before trial.

upon any State representations in making their investments." They further emphasized that "[n]o new reliance issues are raised because Bud Williams, Plaintiff's father, attended meetings, monitored the State's position and relayed its representations to Plaintiffs Jed and Sheila Williams." With these materials before it, the superior court denied the motion.

In light of appellants' admission that the addition of the partnership as a party plaintiff would not involve any new evidence of reliance, we conclude that the amendment issue has been mooted by our holding that appellants failed to establish that element of their promissory estoppel claim. Given that the reliance issues are admittedly identical for appellants and the proposed additional plaintiff, the failure of the appellants to establish the factual predicate for a promissory estoppel claim moots the issue of amendment. In these circumstances, granting or denying leave to amend cannot change the disposition of appellants' or the proposed new plaintiff's claims, since in no event would the elements of promissory estoppel have been proved.

## IV. THE SUPERIOR COURT'S AWARD OF ATTORNEY'S FEES

■■■■■ Appellants' final point is that the superior court erred in its assessment of attorney's fees against them.[15] *Thorstenson v. ARCO Alaska, Inc.*, 780 P.2d 371 (Alaska 1989), addressed the effect of a disproportionate fee award in a case involving multiple plaintiffs. There the superior court had ordered a single plaintiff remaining in the case to pay 75% of defendant's total fee incurred in defending against two plaintiffs. Because this fee was "grossly disproportionate," we found an abuse of discretion, and noted the "perverse incentives" which would result from any other ruling. *Id.* at 377.

The instant case is not analogous to *Thorstenson.* Here appellants were made to bear less than 2% more than their pro-

portional share of the state's fees. Disproportion of this magnitude is unlikely to create the "perverse incentives" underpinning our decision in *Thorstenson.* Moreover, the total fee award of $9,550 compensated the state for less than 20% of its actual total fees. In short, this attorney's fee award was not "grossly disproportionate." Under these circumstances, we hold that the superior court did not abuse its discretion in ordering appellants to pay a slightly disproportionate share of attorney's fees.

AFFIRMED.

---

**15.** We review attorney's fees awards under an abuse of discretion standard. *Cooper v. Carlson*, 511 P.2d 1305, 1309 (Alaska 1973). Under Civil Rule 82(a)(1), the trial court has discretion to determine the amount of the fee award.

Generally, a fee award constitutes an abuse of discretion only when it is "manifestly unreasonable." *Haskins v. Shelden*, 558 P.2d 487, 495 (Alaska 1976).