*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANDREW B., | ) | |
| | ) | Supreme Court No. S-17740 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-06569 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ABBIE B., | ) | |
| | ) | No. 7552 – September 3, 2021 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Jacob A. Sonneborn and Molly Gallagher, Law Office of Jacob Sonneborn, and A. William Saupe, Ashburn & Mason, Anchorage, for Appellant. Kimberlee A. Colbo and Jenna L. Krohn, Hughes White Colbo Wilcox & Tervooren, LLC, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

Before getting married, Andy drafted a prenuptial agreement. Abbie first saw the agreement the night before their wedding, when she was intoxicated. The agreement, designed to protect Andy's substantial assets, designated only certain

earnings marital property. It referenced an investment account for Abbie's benefit, but the paragraph pertaining to this account contained only the words "*Not Used*," and no such account was ever created.

The superior court enforced the agreement over Abbie's objection that it was not voluntarily executed. The court then ruled that all income reported on the parties' tax returns during the marriage is part of the marital estate subject to division and awarded Abbie an additional sum to compensate for the nonexistent investment account. Because this interpretation of the agreement is erroneous and key facts relevant to whether the agreement is enforceable were not addressed, we reverse and remand.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Andrew (Andy) and Abbie B. started living together in 2000.[1] Six years later they decided to get married.

On the eve of their destination wedding in Maui, the parties executed a prenuptial agreement. The agreement includes a number of terms related to the parties' finances. Notably, the agreement provides for a community estate composed of joint checking and savings accounts, to be funded by "50% of each party's earnings by reason of employment or personal services up to [$250,000] each per year . . . ." The agreement states that any "remaining income and income from separate assets shall be the separate property of the party in whose name it stands." It also provides that "in the event their marriage is terminated by court order, the investment account, if any, established pursuant to Paragraph 2.5 [of the agreement], shall be awarded to [Abbie] as her sole and separate property for the purpose of establishing a residence for herself and the [parties']

---

[1]    We use the parties' initials to protect their privacy.

child, if any." Paragraph 2.5, however, does not contain any provisions and instead includes only the words "*Not Used*."

Andy and Abbie had two children during the marriage. After 11 years of marriage, the parties separated; in May 2018, Abbie filed for divorce. The parties resolved custody of their two children without a trial. Abbie has primary physical and sole legal custody of the children, and Andy has flexible visitation.

## B.    Proceedings

### 1.    Hearing on whether to enforce the prenuptial agreement

Abbie filed a motion asking the superior court to declare the prenuptial agreement unenforceable. She argued that her execution of the agreement was involuntary, unconscionable, and the product of duress, and that facts and circumstances had changed since the agreement was entered so as to make its enforcement unfair and unreasonable. Andy opposed the motion.

The superior court held a one-day evidentiary hearing. Andy testified about the impetus for drafting the prenuptial agreement. He said that Abbie was pressuring him to get married, telling him "to make it happen or take a hike." He said that his father, who owned a successful commercial construction company and other businesses, "strongly recommended that in order to protect some of the assets, [Andy] come up with a prenuptial agreement." Andy described owning several businesses and being in "the trailer court business, . . . vehicle storage business, and film production." According to Andy, the trailer court was a family business in which Andy attained ownership from a family trust. He said he received capital to start other businesses from his parents. Andy also said that in the six to twelve months before the wedding, he and his parents "were developing some trusts and some different LLCs and things of that nature."

Andy testified that he drafted the prenuptial agreement using a template provided by a friend who is an attorney, and that he told Abbie that she had to sign the

agreement for the wedding to go through. Andy said that he had previously presented Abbie with a draft of the prenuptial agreement but conceded this draft may have been different from the contract that was eventually presented to Abbie and signed by the parties.

Abbie testified that she saw the prenuptial agreement for the first time on the night of December 6, 2006 — the night before the couple's wedding. The prenuptial agreement states the parties had reviewed a draft of the agreement on December 3, 2006 and had "the opportunity to counsel with his/her independent attorney in connection with the . . . execution of this [a]greement." But Abbie testified that she had not reviewed any drafts nor received legal advice about the agreement.

Abbie testified that at the time of the wedding she was taking narcotic pain medications for a broken leg caused by Andy the month before when he "pulled [her] out of his truck [while] trying to kick [her] out of a parking lot." Abbie said that as a result of these pain medications, plus "three or four drinks at the rehearsal dinner" followed by "more cocktails" with her friends, she was intoxicated when she found the prenuptial agreement. Abbie said she "ha[d] no idea when [she] signed [the prenuptial agreement]"; it could have been either the night before or the day of the wedding, as at both times she was under the influence of alcohol and pain pills.

The superior court denied Abbie's motion. It found that Andy presented the agreement to her sometime between one and three days before the wedding, but that she likely did not see the terms of the agreement until the night before the wedding. It found that "Abbie was more likely than not competent to sign a legally binding contract the day of December 7, 2006, prior to the wedding." The court also found that her "signature was voluntary, in the sense that she was not coerced." It acknowledged Abbie's argument that "the totality of [the] circumstances forced her to make a decision under duress." But despite that observation, the court reasoned that "[e]ven assuming

the domestic violence allegation is true," there was no evidence that Andy "confronted" Abbie about signing the agreement, so she was not "subject to any coercive acts of Andy." The court ruled that Abbie had "not shown by clear and convincing evidence that there was no alternative" to signing the agreement and that the agreement was therefore enforceable.

### 2. Hearing on property division

The superior court later held a property division trial. Andy and Abbie testified to their respective understandings of the prenuptial agreement and described their lifestyle and spending habits during the marriage.

Their testimony depicted an extravagant lifestyle during the marriage, with spending on foreign travel, vacations, visits to Andy's properties in Idaho and Hawaii, an expensive car, jewelry, and other valuable personal possessions. Both parties testified that they spent from a joint account or put their purchases onto credit cards, and Andy paid off the credit cards in part with profits from his businesses; neither party provided any records of this spending. The couple also received an annual $100,000 gift from Andy's parents. However, at the time of divorce, there was no account or set of funds that could be identified as the community estate the parties had agreed to create in the prenuptial agreement.

In its findings of fact and conclusions of law, the superior court observed that the prenuptial agreement was "poorly written," with "missing paragraphs" and "inconsistent statements." The court nonetheless discerned that the prenuptial agreement's primary intent was to keep the parties' separate property separate and protected from division in the event of divorce. The court described what it viewed as the core of the agreement:

> [The] provisions were designed primarily to prevent [Abbie]
> from claiming an ownership interest in [Andy's] and his

family's ongoing and future business interests. In exchange, [Andy] agreed to fund a community estate, fund an investment account and allow consideration of his separate property when dividing the community estate upon divorce.

The superior court found there was no evidence presented of any joint accounts "and certainly no evidence . . . showing deposits or withdrawals from an account designated as a community account." It also found there was no evidence presented indicating that an investment account had been created or funded. The court reasoned that without the community estate and investment account "being honored in good faith by [Andy], the entire prenuptial agreement then is unenforceable" because Andy would "receive the benefit of his bargain, but then be able to control the finances such that [Abbie] does not receive her part of the bargain." Therefore, the court "ha[d] to conclude that [Andy] wants to honor his part of funding the community estate and the investment account."

To enforce Andy's part of the bargain, the superior court constructed a community estate and investment fund for division according to the agreement. In deciding the value of the community estate, the court accepted Abbie's calculations showing that the couple should have contributed $1,457,497 to the community estate over the course of the marriage. The court deducted Abbie's constructive contributions, yielding a figure of $1,123,517.08 in the community estate. It did not deduct any of the couple's expenditures during the marriage from this figure, reasoning that "[m]oney spent during the marriage could easily have been from the defendant gifting his separate money for the family expenses and preserving the marital portion of his income to be deposited into the community estate and the investment account." It then ruled that the estate's value should be divided between the parties on a 70/30 ratio in Abbie's favor due to the greater value of Andy's separate property. The court accordingly ordered Andy to pay Abbie $786,462.

To determine the investment account's value, the superior court relied on the prenuptial agreement's provision stating that the investment account would be awarded entirely to Abbie for the purpose of "establishing a residence for herself" and any children. Accordingly, the court ruled that funds equivalent to the value of the Girdwood home, which the prenuptial agreement described as Andy's separate property, "should have been available to [Abbie] in the investment account to purchase a home." The court ordered that the home's value be assessed and that Andy transfer a sum of money equivalent to the home's assessed value (plus $30,000 for furnishings) to Abbie.

### 3. Andy's motion for reconsideration

Andy sought reconsideration of the superior court's findings of fact and conclusions of law on three grounds. First, he argued that the court erred in calculating Andy's constructive contributions to the community estate because Abbie's calculations (which the court relied on) included Andy's passive income from separate property. He asserted that such income should not be considered "earnings by reason of employment or personal services" that would go towards the community estate under the agreement's terms.

Second, he argued that the superior court had ignored the plain text of the prenuptial agreement by failing to deduct the parties' expenditures from constructive contributions the court used to calculate the value of the community estate.

Third, Andy argued that the prenuptial agreement did not require the creation of an investment account at all. Andy asserted that Paragraph 2.5, the only provision that might have required the creation of any investment account, was deleted and replaced with the words "*Not Used*," indicating the parties did not intend to create one.

The superior court denied Andy's motion for reconsideration. The court noted:

The parties testified, in particular the defendant testified, that he didn't have the slightest clue as to what money was spent or where it came from. The defendant['s] testimony precludes him from now attempting to say that some distinction between community funds and separate property was ever made during the marriage. The court's decision enforces the *defendant's* promises to the plaintiff. At trial he was in the best position to claim some justification for not fulfilling his promise. His testimony to the court was . . . cavalier — he's not a money guy. [Emphasis in original.]

Andy appeals. Abbie did not file a cross-appeal of the superior court's decision denying her motion to declare the prenuptial agreement invalid. In her brief, however, she argues that if we do not affirm the superior court's interpretation of the prenuptial agreement, we should review the superior court's ruling that the agreement is enforceable.

## III. STANDARD OF REVIEW

"We review the 'interpretation of contract language de novo.' "[2] "Under this standard of review, we assess the expectations of the parties to the contract by 'examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.' "[3]

The enforceability of a contract is a mixed question of law and fact. The correct legal standard for determining a contract's enforceability is a question of law that we review de novo, "adopting the rule 'most persuasive in light of precedent, reason, and

---

[2]    *Black v. Whitestone Estates Condo. Homeowners' Ass'n*, 446 P.3d 786, 791 (Alaska 2019) (quoting *Miller v. Fowler*, 424 P.3d 306, 311 (Alaska 2018)).

[3]    *Id.* (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004)).

policy.' "[4]  The underlying factual findings to which the rule is applied, however, are reviewed for clear error.[5]  "We will find clear error only if we are left with a definite and firm conviction on the entire record that a mistake has been made."[6]

## IV.    DISCUSSION

### A.    Under Alaska Law, Prenuptial Agreements Legally Procured And Ostensibly Fair In Result Are Valid.

Alaska law gives effect to prenuptial agreements that set terms for the division of property in the event of divorce.  Historically, prenuptial agreements were "almost universally considered void *ab initio* as contrary to public policy"[7] because they were viewed as "inherently conducive to divorce and as allowing a husband to circumvent his legal duty to support his wife."[8]  But in *Brooks v. Brooks* we recognized that public policy and the nature of society have markedly changed in ways that favor enforcing these agreements.[9]  We observed that prenuptial agreements allow people "the

---

**4**        *See McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 719 (Alaska 2013) (quoting *In re Life Ins. Co. of Alaska*, 76 P.3d 366, 368 (Alaska 2003)).

**5**        *Thompson v. Thompson*, 454 P.3d 981, 988-89 (Alaska 2019).

**6**        *Gambini v. Hamilton*, 440 P.3d 184, 189 (Alaska 2019) (quoting *Tomal v. Anderson*, 426 P.3d 915, 923 n.8 (Alaska 2018)).

**7**        *Brooks v. Brooks*, 733 P.2d 1044, 1048-49 (Alaska 1987).

**8**        *Id*. at 1048 (footnote omitted) (citing RESTATEMENT (SECOND) OF CONTRACTS § 190 (AM. LAW INST.1979)); *see also Crouch v. Crouch*, 385 S.W.2d 288, 293 (Tenn. App. 1964), *overruled by Cary v. Cary*, 937 S.W.2d 777 (Tenn. 1996) ("[S]uch [a] contract is promotive of divorce and void on grounds of public policy.").

**9**        *Brooks*, 733 P.2d at 1049 (footnote omitted)  (citing Doris Jonas Freed & Timothy B. Walker, *Family Law in the Fifty States: An Overview*, 19 FAM. LAW Q. 331, 438 (1986)) ("With the advent of no-fault divorce laws and the changes in society such laws represent, the traditional rule has rapidly given way to the more realistic view that

(continued...)

opportunity to ensure predictability, plan their future with more security, and, most importantly, decide their own destiny."[10] And we expressed optimism that permitting premarital agreements might benefit the institution of marriage itself: "[A]llowing couples to think through the financial aspects of their marriage beforehand can only foster strength and permanency in that relationship."[11] Accordingly, we held that "prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced."[12]

A prenuptial agreement is a contract between parties, so normal rules of contract interpretation apply.[13] Yet prenuptial agreements are not entirely like other contracts. The parties "do not stand at arm's length to each other; there is a relationship of the highest trust and confidence" at the heart of these agreements.[14] For this reason, prenuptial agreements are enforceable only "if certain standards of 'fairness' are met."[15]

---

[9]    (...continued) prenuptial agreements are not void *ab initio* but are valid and enforceable if certain standards of 'fairness' are met.").

[10]    *Id*. at 1050.

[11]    *Id*.

[12]    *Id*. at 1050-51.

[13]    *See Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993) ("[Parties] agree that the financial agreement they entered into in connection with their dissolution of marriage proceeding is a contract subject to interpretation under contract principles."); *see also, e.g.*, *Cook v. Cook*, No. S-8735, 2000 WL 34545642, at *2 (Alaska Jan. 26, 2000) ("We review a premarital agreement de novo, as we review other contracts.").

[14]    5 WILLISTON ON CONTRACTS § 11:8 (4th ed. Nov. 2020 Update).

[15]    *Brooks*, 733 P.2d at 1049.

The inquiry into fairness is both procedural — whether the agreement was freely entered into — and substantive — whether the terms of the agreement are unconscionable.[16]

The prenuptial agreement in this appeal raises questions about both procedural and substantive fairness. As the superior court observed, it is "poorly written," with inaccurate statements and cross-references to omitted portions that make it difficult to discern the reasonable expectations of the parties. Its terms are largely one-sided when considered in light of the parties' relative financial status both at the time it was signed and at the time of divorce. And the agreement, which Andy drafted by himself, was presented to Abbie at the last minute on the eve of their destination wedding, while she was under the influence of alcohol and painkillers.

The superior court upheld the validity of the prenuptial agreement over Abbie's objection. Then, avoiding what it viewed as an inequitable result, the court adopted Abbie's arguments about the intent of the agreement and her calculations of what she was entitled to. We conclude that certain aspects of the court's ruling are erroneous because they do not reflect the reasonable intent of the parties, as best as can be discerned from the agreement's text and the limited extrinsic evidence. We also exercise our discretion to address Abbie's argument that the prenuptial agreement is unenforceable and conclude that the court did not apply the correct standard in determining whether the agreement is enforceable. We therefore remand this case for further proceedings.

**B.    The Calculation Of The Community Estate Is Erroneous.**

A primary goal of the prenuptial agreement, as the superior court observed, was to keep "separate property separate" and to prevent Abbie from claiming an interest

---

[16]    *See id.* at 1049-50 (describing standards typically applied by state courts and articulated in Uniform Premarital Agreement Act).

in Andy's and his family's business interests. To this end, the agreement provides for a community estate composed of joint checking and savings accounts, to be funded by "50% of each party's earnings by reason of employment or personal services up to [$250,000] per year." This arrangement enables the "acquisition of a community estate" as well as payment of the family's expenses while ensuring "[t]he remaining income and income from separate assets shall be the separate property of the party in whose name it stands."

Because the parties presented no evidence of a designated account for the community estate or any tangible attempts to follow this plan, the superior court estimated the value of the community estate by calculating the contributions that should have been made to it. The court relied on one of Abbie's exhibits containing a table of the parties' income during the years of marriage stating that it accepted the exhibit "as a fair and reasonable calculation of the community estate available for division." In doing so, the court adopted Abbie's implicit assertion that these income figures represented "earnings by reason of employment or personal services," 50% of which were destined for the community estate under the agreement's terms.

Yet Andy asserts that the income figures attributed to him inappropriately include capital gains, interest income, and other investment income flowing from his ownership interests in his and his parents' separate businesses. These sources of income, he argues, are not "earnings by reason of employment or personal services."

We agree with Andy that the superior court's calculations rest on an error. The court did not explain why it concluded that Abbie's exhibit accurately represents the value of contributions to the community estate, so it is not clear whether the court's calculations reflect a legal ruling or a factual one. Regardless, both would be incorrect. As a question of contract interpretation reviewed de novo, the phrase "earnings by reason of employment or personal services" cannot be interpreted to include income from

separate assets unrelated to Andy's work. And as a factual matter, it would be clearly erroneous to conclude that all of the income figures the superior court relied on to calculate the value of the community estate represent income related to work.

### 1. The parties did not intend for income unrelated to employment to fund the community estate.

The meaning of the phrase "earnings by reason of employment or personal services" is a question of contract interpretation and therefore a question of intent.[17] To determine the intent of the parties, we assess "the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties."[18] "Extrinsic evidence is evidence 'other than the language of the contract that bears on the parties' intentions.' "[19] "The extrinsic evidence that may be considered includes 'the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated,' as well as the conduct of the parties after the contract was entered into."[20] "Extrinsic evidence 'is always admissible on the question of the meaning of the contract itself.' "[21] "[I]t is not necessary to find that an agreement is ambiguous before looking to extrinsic evidence as an aid in determining what it means."[22] Therefore, we "may

---

[17]     *See Sowinski v. Walker*, 198 P.3d 1134, 1143 (Alaska 2008) ("The goal of contract interpretation is to give effect to the reasonable expectations of the parties.").

[18]     *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996).

[19]     *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 316 (Alaska 2013) (quoting *Wright v. Vickaryous*, 598 P.2d 490, 497 n.22 (Alaska 1979)).

[20]     *Id*. (quoting *Peterson v. Wirium*, 625 P.2d 866, 870 n.7 (Alaska 1981)).

[21]     *Id*. (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004)).

[22]     *Id*. (quoting *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162,
(continued...)

initially turn to extrinsic evidence in construing a contract for 'such light as it may shed on the reasonable expectations of the parties.' "[23]

Both the express language of the prenuptial agreement and the relevant extrinsic evidence suggest that Andy and Abbie did not intend for the community estate to be funded by income unrelated to employment. Section 2.6 of the agreement ("Community Contributions") provides, in relevant part:

> The parties intend that during the marriage, each of them will continue working outside the home for the purpose of earning income for the benefit of the community. *To pay family and other community expenses, and for the acquisition of a community estate*, it is agreed as follows:
>
> [Section 2.6.1] The parties shall open one or more joint checking and savings accounts. Any such joint account shall be considered to be community property. *The funds in the account shall be used to pay family expenses and for other community property purposes*. Neither party shall expend any funds from the joint accounts for any purpose related to his/her separate property or separate liabilities or obligations without the consent of the other spouse, except as otherwise required by law.
>
> [Section 2.6.2] The parties agree that *a fair and reasonable compensation for the community shall be 50% of each party's earnings by reason of employment or personal services* up to [$250,000] per year[,] except that in any partial year, the income shall be pro rata by month (maximum community income is [$20,833] per party per month). The

---

**22** (...continued)
167 (Alaska 2007)).

**23** *Id.* (quoting *Alyeska Pipeline Serv. Co., v. O'Kelley*, 645 P.2d 767, 777 n.1 (Alaska 1982)).

remaining *income and income from separate assets shall be the separate property of the party in whose name it stands.*[24]

The italicized language emphasizes two goals. First, creating a pool of marital funds for spending on "family and other community expenses" and for "acquisition of a community estate." Second, ensuring that "income from separate assets shall be the separate property of the party in whose name it stands."

The agreement distinguishes between "community" (i.e., marital) and separate assets by defining the source of the community funds: "50% of each party's earnings by reason of employment or personal services." This proviso is the key for determining how much money should have gone into the community estate. To estimate what the community estate's value should have been, the superior court had to decide which funds were "earnings by reason of employment or personal services."

The text of the agreement suggests that at least some "income from separate assets" can be "earnings by reason of employment or personal services" that are obliged to the community estate. Although "earnings" and "income" are different words, the agreement itself reveals no intent that they apply to different categories of funds. For instance, the terms are used interchangeably in the same sentence of Section 2.6.2 itself (the community estate "shall be 50% of each party's *earnings* by reason of employment . . . , except that in any partial year, the *income* shall be pro rata. . . .)." (Emphasis added.) The agreement's recitals also support the view that earnings and income are interchangeable. They describe Andy's "income by reason of his ownership interest" in his file company as equivalent to Abbie's part-time work in construction.

---

[24] Emphasis added.

This suggests that Andy's income from his film company constitutes "earnings by reason of employment"[25] despite his company being a separate asset.

But clearly the agreement did not oblige 50% of *all* types of income/earnings (up to $250,000 per year) to the community estate, because that would render the qualifying language ("earnings by reason of *employment or personal services*") meaningless. (Emphasis added.) The meaning of "employment" is fairly straightforward: having a paying job or working for money.[26] "[E]arnings by reason of employment" is therefore money that one receives from working at a job. The term "personal services" is less obvious. Abbie does not explain what this term might mean. Andy relies on an IRS definition providing that "personal services" means an activity in various professional fields like accounting, architecture, health, or the law.[27] In the context of this prenuptial agreement, Andy's definition seems apt: earnings received in exchange for providing a valuable service of some kind. How earnings from "personal services" might be distinct from employment earnings is immaterial. What seems clear is that this phrase is intended to apply to money received in exchange for providing some kind of service or work — not passive income received regardless of whether one performs any kind of work or service. The most plausible interpretation of the agreement is that only earnings or income earned by working in some way are obliged to the

---

[25]     Andy is also described in Paragraph 1.8 of the agreement as a "Film Maker."

[26]     BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "employment" as "the condition of having a paying job" and "[w]ork for which one has been hired and is being paid by an employer").

[27]     *See* I.R.S. Pub. 542, Corporations, at 3 (Feb. 14, 2019).

community estate; passive income from a trust or a share in separate family businesses for which Andy does not perform work is not pledged to the community estate.[28]

Abbie argues that excluding passive income from "earnings by reason of employment or personal services" yields such a small sum of money that it makes the community estate provision meaningless. To support this argument she asserts that Andy had no "wages, earnings, and tips" — a category of income described on IRS income tax forms — for seven years of the couple's marriage. Andy counters, pointing to the couple's tax returns, that if the provision includes income from self-employment at his businesses, then the amount is a modest but not absurdly small sum.

Andy's interpretation is more consistent with the language of the prenuptial agreement because it seems to include money received when freelancing or self-employed (personal services), not just money received working for someone else (employment). Andy's interpretation is also consistent with the agreement's treatment of his film company, because his income from that business (which he owns) is equated to Abbie's income from working a construction job. It is true that if "earnings by reason of employment and personal services" includes only "wages, salaries, tips, etc.," as Abbie suggests, then the amount of earnings would be extremely small.[29] But under Andy's interpretation — where "earnings by reason of employment and personal

---

[28]    The language used in other provisions of the agreement supports this conclusion. Sections 2.3 and 2.4 explicitly provide that the separate property of each party "shall remain his [or her] sole and separate property throughout [the] marriage . . . subject entirely to his [or her] individual ownership, control and management." Section 2.16.4 also provides that "in the event of a separation or termination of the marriage by court order, neither party shall claim any right, title or interest in the separate property of the other, except as otherwise provided herein."

[29]    Andy's overall total "wages, salaries, tips, etc." during the marriage was only $64,708.08 — a mere 18% of the couple's total "wages, salaries, tips, etc." during the marriage.

services" includes not only his "wages, salaries, tips, etc." but also his business earnings and other miscellaneous income related to working — the income figure is more reasonable. Based on the couple's joint tax returns from 2007 to 2018, this varied between $4,438 and $95,929 per year.[30]

Additionally, the testimony suggests that the couple's spending was funded in large part by gifts from Andy's parents and his income from trusts and passive holdings. Section 2.10 of the agreement contemplates that separate property could be gifted and spent on community needs. Therefore, it is reasonable to believe that the parties intended the funding stream for the community estate to derive only from income received in exchange for work. Although this funding source was modest compared to their spending habits, when supplemented by gifts of Andy's separate income and gifts from his parents, it is substantial enough to plausibly reflect the parties' reasonable intent.

**2.    At least some of the income figures used by the court to value the community estate are not "earnings by reason of employment or personal services."**

Because the superior court did not explain why it fully adopted Abbie's calculation of the community estate, it is possible that the court found that all of Andy's income over the years was received in exchange for work. But such a finding would be clearly erroneous. For instance, Abbie's calculations included the parties' Permanent Fund Dividend (PFD) income, which is clearly not earned "by reason of employment or personal services." Other sources of income are less easily categorized. The tax returns indicate that a substantial source of Andy's income was rental income from properties that he owned, including a mobile home in Anchorage, a cabin in Girdwood, and a

---

[30]    This excludes a loss of $31,844 in 2008, which is an outlier and due to a business loss of $37,240.

residence in Washington state.[31]   The court made no findings on whether Andy performed any work in connection with renting these properties, and we see no evidence in the record that he did.  Similarly, the tax returns indicate that Andy received income from capital gains.  The court did not make any findings on whether Andy performed work in connection with this income.  It was error not to apply the prenuptial agreement's definition of "earnings by reason of employment or personal services" to these distinct types of earnings, as Andy argued in closing.[32]  We therefore vacate the superior court's decision on the value of the community estate and remand for further proceedings.

### 3.     The superior court did not clearly err by declining to deduct taxes or expenses from the value of the community estate.

Andy contends that the superior court should have deducted community expenditures from the value of the community estate before dividing it between the

---

[31]     Abbie's trial exhibit containing a table of the parties' income during the marriage does not expressly indicate these other categories of income; however, it can easily be discerned.  For instance, based on Abbie's calculations, Andy had an income of $136,388.08 in 2007.  Based on his tax returns that year, he earned only $6,883.08 in wages, reported nothing from his business, and reported $17,749 in miscellaneous income.  The only way Abbie could have reached the totals she did was by including significant sources of Andy's income besides wages, business earnings, and miscellaneous income.

[32]     The superior court's order denying reconsideration faulted Andy for not having "the slightest clue as to what money was spent or where it came from" and ruled that his cavalier testimony "precludes him from now attempting to say that some distinction between community funds and separate property was ever made during the marriage." This observation is apt as to whether expenditures should have been deducted from the community estate, discussed below.  But the couple did track the sources of their income to some degree, as illustrated by the tax returns presented to the court, and the parties did testify about what Andy's assets were and what work he did (or did not do).  The superior court was required to apply the terms of the prenuptial agreement to the evidence before it.

parties. We conclude that the court did not clearly err by not doing so because no evidence was presented about the source of funds spent by the couple. The court observed that the couple "did not identify a specific community account nor did they attempt to track income, expenses and whether marital money was spent or non-marital money was gifted to the community estate." Absent evidence showing otherwise, "[m]oney spent during the marriage could easily have been from [Andy] gifting his separate money for the family expenses and preserving the [marital] portion of his income to be deposited into the community estate and the investment account." In other words, because Andy did not provide evidence to show that either he or Abbie tracked their spending, the court could not conclude that "marital" money was indeed spent.

Andy fails to convince us that the superior court clearly erred. He points to testimony that there was a "joint account" out of which marital bills were paid. Yet all sorts of funds — including gifts and the "majority" if not all of the parties' income — were deposited in the joint account, so the fact that marital bills were paid out of the joint account does not establish that the bills were paid with the 50% of "earnings by reason of income or personal services" pledged to the community estate. It is clear that the parties spent freely. But because there are no records showing the community estate was spent on marital expenses, we cannot say that the superior court clearly erred by finding that the couple's marital expenditures were funded by gifts of non-marital funds by Abbie, Andy, and Andy's parents.

C.     **It Was Error To Conclude That The Agreement Promised Abbie An Investment Account Funded Solely With Andy's Separate Property.**

The superior court ruled that the prenuptial agreement reflects the parties' intent to create an investment account for the purpose of allowing Abbie to establish a residence in the event of divorce. Because no such account existed at the time of divorce, the court ordered Andy to pay Abbie an amount equivalent to the value of the

home they lived in while married. Andy challenges these rulings, arguing that the text of the agreement shows the parties did not intend to create an investment account. And even if they did, Andy argues, it was error to require him to fund this account, which the parties neither set up nor contributed to during marriage, with his separate property. We agree with Andy. The prenuptial agreement cannot be reasonably interpreted to include a promise to create an investment account funded by Andy's separate property. It was therefore error to order Andy to pay Abbie the value of the Girdwood house (plus $30,000 for furnishings) as compensation for the non-existent account.

As explained above, we seek to enforce the reasonable expectations of the parties.[33] We assess the parties' expectations when the contract was made by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence (including the subsequent conduct of the parties).[34] "Extrinsic evidence is evidence 'other than the language of the contract that bears on the parties' intentions.'"[35] The extrinsic evidence that may be considered includes 'the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated,' as well as the conduct of the parties after the contract was entered into."[36]

---

[33]     *See Municipality of Anchorage v. Gentile*, 922 P.2d 248, 255-56 (Alaska 1996).

[34]     *Id*. at 256.

[35]     *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 316 (Alaska 2013) (quoting *Wright v. Vickaryous*, 598 P.2d 490, 497 n.22 (Alaska 1979)).

[36]     *Id*.

We do not construe prenuptial agreements against the drafter.[37] And we reject Abbie's argument that the prenuptial agreement is a contract of adhesion that should be construed against Andy, who drafted it. A contract of adhesion arises in commercial settings, when "the parties are 'of such disproportionate bargaining power that [one of them] could not have negotiated for variations in the terms of the standard [contract]'."[38] "Such contracts are typically 'standard forms prepared by one party and submitted to the other on a "take it or leave it" basis.'"[39] Even though the agreement here was presented in a "take it or leave it" manner — and Abbie may not have realistically been able to negotiate better terms — it is not an adhesion contract because it is not a standard form, but was instead specifically made by Andy for the purpose of his marriage with Abbie.

The most salient fact about the disputed investment account is that the provision establishing it was purposely omitted from the prenuptial agreement. Paragraph 2.16.4 provides that "in the event [Andy and Abbie's] marriage is terminated by court order, the investment account, if any, established pursuant to Paragraph 2.5 herein, shall be awarded to [Abbie] as her sole and separate property for the purpose of establishing a residence for herself and the [parties'] child, if any." Yet Paragraph 2.5 does not contain any terms other than the phrase: "*Not Used.*"

---

[37]    *See Hussein-Scott v. Scott*, 298 P.3d 179, 183 n.14 (Alaska 2013) ("We have refused to construe a marriage settlement agreement against the drafting party.").

[38]    *OK Lumber Co. v. Alaska R.R. Corp.*, 123 P.3d 1076, 1081 (Alaska 2005) (alterations in original) (quoting *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 25 n.7 (Alaska 1997)).

[39]    *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 n.1 (Alaska 1979) (quoting *Standard Oil Co. of Cal. v. Perkins*, 347 P.2d 357, 379 n.5 (9th Cir. 1965)).

Abbie argues that because Andy spent so much time working on the draft of the prenuptial agreement before presenting it to Abbie, the "only logical explanation" for the mention of the investment account is that he intended to create one. But even knowing that Andy was responsible for drafting the agreement, it cannot be reasonably read to manifest that intent. The first and only mention of the investment account is made on page 14 of the agreement, at Paragraph 2.16.4. This paragraph's reference to "the investment account, if any, established pursuant to Paragraph 2.5" implies that Paragraph 2.5 describes how the account will be created. A reasonable reader would flip back to Paragraph 2.5 and, seeing that paragraph was purposely "[n]ot [u]sed," infer that the drafter did not intend for any investment account to be established. At the very least, the reader would have great reason to doubt that any investment account was promised.

Those doubts are even more justified because the sole reference to the investment account contemplates that it may not exist at all: Abbie has a right only to "the investment account, *if any*, established pursuant to Paragraph 2.5." (Emphasis added) Without seeing the original draft contract Andy received from his friend, there is no way of knowing what this contingent language might have originally meant before the deletion of Paragraph 2.5. If the terms of Paragraph 2.5 had required the creation of an investment account, then the phrase "if any" may have been meant as a recognition that the account, once created, might cease to exist for a variety of reasons (like investment losses or the need to use it for other family purposes). But in the context of *this* agreement, in which terms establishing an investment account were intentionally deleted, this language cannot reasonably suggest that an investment account has been promised.

Another problem is the lack of any mention of how the investment account will be funded. Abbie suggests that deleting Paragraph 2.5 can be reasonably read as an intent to discard whatever specific terms existed regarding the creation of the account

while retaining an undefined obligation to fund it. That reading is not plausible in light of the way the agreement precisely defines how separate assets can become marital assets. The agreement goes to great lengths to ensure that the parties' separate property remains separate except where specifically provided otherwise. The terms governing the community estate identify a specific source and amount of income that must be contributed to that joint asset. There are no comparable specific obligations tied to the investment account. Therefore, particularly in light of the contrast between the provisions for the community estate and Paragraph 2.16.4's mention of the investment account, the agreement cannot be reasonably read to promise the contribution of separate property to an investment account for Abbie's benefit.

The superior court acknowledged the omission of Paragraph 2.5 but relied on the stated purpose of the investment account — to allow Abbie to establish a residence for herself and any children in the event of divorce — to conclude that the parties intended to fund this account. But this puts the cart before the horse: the purpose of a promise is immaterial if it is not actually a promise. And there is no promise if the promisor states that performance is optional (e.g., "the investment account, if any, . . . shall be awarded to [Abbie]") and disclaims any obligations related to the performance. For the same reason, other provisions of the agreement showing an intent to financially protect Abbie in certain situations — giving her ownership of the house in the event of Andy's death and allowing the court to consider Andy's separate property when dividing the estate if the parties had children — do not change the proviso mentioning the investment account from an illusory promise into a real one. So too with Andy's testimony at trial that his intent in drafting the agreement was to provide some money for Abbie and "not leave her homeless." The superior court did not find, and the testimony does not indicate, whether Andy made that intent clear to Abbie at the time they entered into the agreement. But even if he did, it would not support a reasonable

expectation that he would fund an investment account for her in the event of divorce given the noncommittal language in the agreement, especially when the terms providing for acquisition of a community estate serve that purpose as well.

The superior court reasoned that the agreement had to include an investment account or it would be unenforceable for lack of consideration. Not so. In a prenuptial agreement, "[c]onsideration should not be confused with the adequacy of the provisions of the agreement. The marriage itself is the consideration."[40] Because a prenuptial agreement is "a contract entered into between two people in contemplation and consideration of marriage[,] [t]he marriage provides the requisite consideration to bind both parties."[41] Therefore, the fact that an agreement provides little tangible benefit to one spouse in divorce is not a reason to interpret the agreement inconsistently with its terms.

Instead of rewriting a one-sided prenuptial agreement, the superior court may consider whether it was unconscionable when executed or whether circumstances have changed, making enforcement unfair and unreasonable.[42] Abbie made the latter

_____

[40] BRETT R. TURNER & LAURA W. MORGAN, ATTACKING & DEFENDING MARITAL AGREEMENTS § 8.041, at 372 (2d ed. 2012). Other state courts have agreed with this principle. *See, e.g.*, *In re Estate of Onstot*, 277 N.W. 563, 567 (Iowa 1938)*; Stewart v. Stewart*, 76 A.3d 1221, 1229 (Md. Spec. App. 2013); *Brady v. Brady*, 118 N.Y.S. 3d 883 (App. Div. 2020); *In re Marriage of Foran*, 834 P.2d 1081, 1086 n.5 (Wash. App. 1992) (citing *Friedlander v. Friedlander*, 494 P.2d 208 (Wash. 1972)); *Long v. Long*, 413 P.3d 117, 122 (Wyo. 2018).

[41] *Long*, 413 P.3d at 122 (quoting *Combs v. Sherry-Combs*, 865 P.2d 50, 53 (Wyo. 1993)).

[42] *See Compton v. Compton*, 902 P.2d 805, 809 n.4 (Alaska 1995) ("We will not enforce a prenuptial agreement if the facts and circumstances have changed since the agreement was executed so as to make enforcement unfair and unreasonable."); *Brooks*
(continued...)

argument in her closing at trial, citing our decisions in *Brooks* and *Compton* to argue that the superior court should award Abbie the home that the parties lived in during marriage.[43]  After closing arguments, the superior court remarked that "it would be entirely inequitable for [Abbie] to walk away with nothing."  By interpreting and enforcing the agreement as it did — to include an investment account for Abbie and to direct 50% of the parties' total income to the community estate — the superior court's rulings avoided that seemingly inequitable result.  But because we reverse these rulings as erroneous, the superior court must on remand address Abbie's argument that enforcing the prenuptial agreement would be unfair and unreasonable.

**D.     It Was Error To Reject Abbie's Argument That The Prenuptial Agreement Should Be Voided For Lack of Voluntariness.**

Abbie argues that, if and only if we reverse the superior court's rulings on the interpretation of the prenuptial agreement, we should review its ruling that the

---

[42]     (...continued)

*v. Brooks*, 733 P.2d 1044, 1049 (Alaska 1987) (observing that courts typically uphold prenuptial agreement "if certain standards of 'fairness' are met," considering whether agreement was "unconscionable when executed" and whether "facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable").

In *Brooks* we also recognized that premarital agreements may be held unenforceable if "obtained through fraud, duress or mistake, or misrepresentation or nondisclosure of material fact" or if a "party did not execute the agreement voluntarily." *Id*. (first quoting *Scherer v. Scherer*, 292 S.E.2d 662, 666 (Ga. 1982), and then quoting UNIF. PREMARITAL AGREEMENT ACT § 6, 9A U.L.A. 383-84).  These latter standards do not address whether the terms of the agreement are fair.  Instead they address whether the agreement was procured in a fair way.  We address the issue of procedural fairness below.

[43]     Abbie did not argue that the terms of the agreement were unconscionable when executed, either in her motion to invalidate the prenuptial agreement (an omission the superior court noted) or at trial.

agreement is enforceable. Although Abbie did not file a cross-appeal to preserve this issue for appeal as required by the appellate rules, we exercise our discretion to relax the rules and consider Abbie's cross-appeal.

Under Alaska Appellate Rule 204(a)(2), once a party has filed a timely notice of appeal, any other party may cross-appeal within 14 days. We have consistently held that an appellee's failure to cross-appeal in a timely manner waives the right to contest rulings by the trial court.[44] This appeal involves a more unusual scenario: a conditional cross-appeal, in which the appellee seeks review of the trial court's ruling only if the original appellant's appeal is successful. We have previously entertained a conditional cross-appeal,[45] but the appellate rules do not specifically mention them. Because the procedure for conditional cross-appeals is not spelled out with complete clarity, and because we have long held that we may address an issue sua sponte if it "was raised at the trial and is adequately briefed on appeal and if opposing counsel are sufficiently apprised of the issue,"[46] we exercise our discretion here to relax Rule

---

[44]    *See, e.g.*, *Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004); *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 265 n.26 (Alaska 1996); *McQuery v. McQuery*, 902 P.2d 1326, 1327 n.3 (Alaska 1995); *Cameron v. Hughes*, 825 P.2d 882, 885 n.5 (Alaska 1992); *Jackson v. Nangle*, 677 P.2d 242, 247 n.3 (Alaska 1984).

[45]    *See McCubbins v. State, Dep't of Nat. Res., Div. of Parks & Recreation*, 984 P.2d 501, 507 & n.7 (Alaska 1999). In *McCubbins* we entertained the State's conditional cross-appeal over the appellant's objection that the cross-appeal was not properly preserved in the points on appeal. *Id.* The defendant did not argue that a conditional cross-appeal is not permitted at all, so we did not have occasion to hold that conditional cross-appeals are expressly permitted by the appellate rules. *Id.* Andy does not argue that a conditional cross-appeal is not permitted, only that it was not properly preserved in this case.

[46]    *Mullen v. Christiansen*, 642 P.2d 1345, 1350 (Alaska 1982); *see also* Alaska R. App. P. 521 (stating that Alaska Appellate Rules may be relaxed to avoid
(continued...)

204(a)(2) and consider the agreement's validity. Andy was sufficiently apprised of this issue both at trial and on appeal, so our addressing this issue does not cause unfair prejudice.

Abbie moved before trial to have the agreement declared voidable on four grounds: (1) she did not enter into the agreement voluntarily; (2) the circumstances of the agreement's execution were unconscionable; (3) she was subject to duress; and (4) circumstances had changed, making enforcement of the agreement unconscionable. The voluntariness and unconscionability objections rested on similar arguments: that Andy "waited until [Abbie] was exhausted, intoxicated and hours before the scheduled marriage to provide her with the [a]greement"; that Abbie's intoxication inhibited her understanding of the terms and consequences of the agreement; and that she had no opportunity to seek legal counsel to understand its implications. The duress and changed circumstances arguments rested on allegations of domestic violence. Abbie maintained that Andy had assaulted her weeks before the wedding and that she signed the agreement out of fear. This abuse continued during the marriage, she alleged, making it inequitable to enforce the agreement now, even if it was valid when signed.

The superior court upheld the agreement over these objections. On the one hand, the court found it "highly unlikely" that Abbie was aware of the "actual proposed agreement" until after dinner the night before the wedding; she therefore "had little time to contemplate the terms and consequences of the agreement and was not realistically provided time to review financial disclosures or demand additional disclosures." On the other hand, the court (alluding to Abbie's intoxication) found that she was "more likely than not competent to sign a legally binding contract" on the morning of the wedding.

---

**46** (...continued)
injustice, implying that they are not jurisdictional).

And it found that "Abbie's signature was voluntary, in the sense that she was not coerced." Based on these findings, the court ruled that Abbie failed to show that the agreement "was unconscionable when executed or that the enforcement of the agreement today would be unfair or unreasonable." It also ruled that Abbie failed to show the agreement was signed under duress. Without making an express finding about whether the alleged assault weeks before the wedding actually occurred, the court ruled that Abbie was not forced to sign the agreement because Andy never "confronted her" about it and was absent when she was making her decision. The court concluded that although choosing not to get married at her destination wedding "would have been an awful moment, Abbie had a choice and was free to make that choice."

Abbie argues that the superior court's decision to enforce the prenuptial agreement fails to adequately address the "perfect storm" that Andy created by presenting her the prenuptial agreement at the last minute, with no opportunity to seek independent counsel, and while she was intoxicated. The court analyzed Abbie's predicament through the lens of duress, and Abbie does not challenge its duress analysis.[47] But she points out that duress is not the only standard for assessing the

---

[47]     Although Abbie argued below that (1) she signed the prenuptial agreement under duress as a result of Andy's assault several weeks earlier and (2) domestic violence during the marriage made enforcing the agreement unfair and unreasonable, she does not argue on appeal that the superior court erred in rejecting these grounds for voiding the agreement. We therefore do not decide whether the court erred. However, we do address a point raised by the court's finding that Abbie was not subject to coercive acts by Andy because he never confronted her about the agreement and was absent while she was deciding whether to sign. If there is domestic violence in a relationship, the fact that one partner does not directly confront or threaten the other about signing a prenuptial agreement may not be dispositive of whether the agreement was executed under duress or the related doctrine of undue influence. *See In re Adoption of S.K.L.H.*, 204 P.3d 320, 328 & n.41 (Alaska 2009) ("Undue influence is the exercise of sufficient control over
(continued...)

validity of a prenuptial agreement, citing our decision in *Brooks v. Brooks*.[48] In *Brooks* we identified several "standards of 'fairness'" for prenuptial agreements, including the Uniform Premarital Agreement Act's rule that a prenuptial agreement must be "voluntarily" entered into.[49] We ultimately did not decide in *Brooks* (nor have we since)

---

[47] (...continued)
a person that (1) deprives that person of freedom of choice or overcomes that person's free will and substitutes the will of another in its place; (2) 'precludes [that person's] exercise of free and deliberate judgment'; or (3) 'coerces [that] person into doing something' that would not have been done absent the influence." (quoting 25 AM. JUR. 2D *Duress and Undue Influence* § 36 (2004))). Domestic violence is often characterized by a pattern of "coercive control" that affects the battered partner's perception of the choices available and the consequences of those choices. *See, e.g.*, Jeffrey R. Baker, *Enjoining Coercion: Squaring Civil Protection Orders with the Reality of Domestic Abuse*, 11 J.L. & FAM. STUD. 35, 47-48 (2008) ("A batterer's coercion does not force a victim's compliance by physical assault but does deprive a victim of liberty and volition by distorting her choices or perceived choices, and the price to pay for disobedience."). Courts must be sensitive to this dynamic when evaluating the validity of a prenuptial agreement if allegations of domestic violence are made.

[48] 733 P.2d 1044 (Alaska 1987). Abbie also invokes the covenant of good faith and fair dealing to support her argument. But this doctrine applies only to the behavior of parties who have already entered a contract; it "does not deal with good faith in the formation of a contract." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. c (AM. LAW INST.1981) ("Bad faith in negotiation [is] the subject[] of rules as to capacity to contract, mutual assent and consideration and of rules as to invalidating causes such as fraud and duress.").

[49] *Id.* at 1049 (quoting UNIF. PREMARITAL AGREEMENT ACT § 6(a), 9A U.L.A. at 383-84) (noting that presumption of valid prenuptial agreement can be rebutted "if the party seeking invalidation of the prenuptial agreement proves that . . . that party did not execute the agreement voluntarily").

which of these various standards applies to prenuptial agreements in Alaska.[50] We now have occasion to address this issue.

We hold that a court must decline to enforce a prenuptial agreement if the party seeking to avoid enforcement proves that it was not voluntarily entered into. Proving that the agreement was not voluntarily entered into is not the same as proving that the agreement was the product of duress. Rather, the test for voluntariness is distinct, reflecting the special circumstances in which prenuptial agreements are formed. As a leading treatise on prenuptial agreements explains, parties engaged to be married are in a relationship of "extreme mutual confidence" that "presents a unique situation unlike the ordinary commercial contract situations where the parties deal at arm's length."[51] "Because of the confidential relationship, the courts insist that the [prenuptial] agreement be 'voluntary' in a way that is somewhat different from . . . the common law contract doctrines of duress and undue influence."[52] The doctrine of duress, which invalidates a contract only when one party is actually forced into it by the other,[53] is appropriate protection in the commercial context where parties stand at arm's length and

---

[50]    *See id.* at 1051 ("We express no opinion, however, regarding the enforceability of the Brooks' agreement under the above enunciated standards.").

[51]    TURNER & MORGAN, *supra* note 40, § 10.01, at 390.

[52]    *Id.* at 391; *see also Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996) (noting that property settlement agreement in divorce "should be controlling in the absence of fraud, duress, concealment of assets or other facts showing that the agreement was not made *voluntarily and with full understanding*" (emphasis added) (quoting *Kerslake v. Kerslake*, 609 P.2d 559, 560 (Alaska 1980))).

[53]    A party seeking to void a contract on grounds of duress must show by clear and convincing evidence that (1) one party involuntarily accepted the terms of the other party, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party. *Hawken Nw., Inc. v. State, Dep't of Admin.*, 76 P.3d 371, 377 (Alaska 2003).

are presumed to be acting in their rational self-interest. But parties engaged to be married have a "tendency to think in terms of mutual interest rather than self-interest" and so are "uniquely vulnerable to overreaching";[54] more protection is required to ensure that a prenuptial agreement is truly voluntary.

To ensure sufficient protection for vulnerable parties, courts examining the voluntariness of a prenuptial agreement consider the amount of time given to sign,[55] the ability to consult independent counsel,[56] and the ability of the parties to understand the agreement.[57] No single factor is dispositive. Courts have instead tended to assess the combined effect of these facts on the party claiming the agreement was not voluntarily executed.[58] We agree that these factors — amount of time to review the agreement's

---

[54] *See* TURNER & MORGAN, *supra* note 40, § 10.01, at 391.

[55] *See id.* § 10.022, at 393 ("Where the agreement was not even discussed informally until days or hours before the marriage, courts have been more reluctant to enforce the agreement."); *see also Zimmie v. Zimmie*, 464 N.E.2d 142, 146-47 (Ohio 1984) (finding prenuptial agreement not voluntary when wife first learned of agreement one day before wedding).

[56] *See* TURNER & MORGAN, *supra* note 40, § 10.03, at 395-98 ("[I]f a spouse never had an opportunity to obtain counsel the agreement is deemed involuntary.").

[57] *See id.* § 10.04, at 398-99; *accord Notkin*, 921 P.2d at 1111 (affirming superior court's decision to set aside property settlement in divorce; although spouse with limited English proficiency "knew in a general way that she was accepting an unfair arrangement in exchange for some immediate cash and finality," her "lack of familiarity with financial and property matters and her difficulties in communication support the conclusion that she lacked a full understanding of what she was doing").

[58] *See* TURNER & MORGAN, *supra* note 40, § 10.01, at 391 ("None of these factors alone is likely to invalidate an agreement, but the combined effect of all the factors may eventually make the agreement sufficiently involuntary that the court will not enforce it.").

terms, ability to consult independent counsel, and ability to understand the terms — are essential to deciding whether the agreement was voluntary.

Abbie presented evidence relevant to these factors, but the superior court's findings do not address them all. The court did make findings about how much time she was given to review the agreement, finding it "highly unlikely" that Abbie was aware of the actual proposed agreement until the evening before the wedding day. It also found that Abbie "had little time to contemplate the terms and consequences of the agreement and was not realistically provided time to review financial disclosures." As for the ability to consult independent counsel, although the court questioned Andy about whether Abbie realistically had the chance to do so, it made no finding on this point.[59] Finally, Abbie testified that she was under the influence of narcotic painkillers and alcohol at the time she reviewed the agreement. The court found that she was "more likely than not competent to sign" a contract on the morning of the wedding. But it made no finding about her level of intoxication or whether she was capable of understanding the contract — which the court later described as "poorly written to say the least." Because the question of voluntariness is one of fact, and the court did not consider all the factors pertinent to whether Abbie's execution of the agreement was truly voluntary, we remand this case for additional findings consistent with this opinion.

## V. CONCLUSION

We therefore VACATE the superior court's judgment and REMAND for further proceedings consistent with this opinion.

---

[59] *See id.* § 10.03, at 395 ("[I]t is not the actual presence or lack of counsel that is the focus, but rather the ability and opportunity to consult independent counsel in a meaningful way."); *see also In re Yannalfo*, 794 A.2d 795, 797-98 (N.H. 2002) (refusing to presume wife did not have opportunity to consult with counsel even though prenuptial agreement was presented one day before wedding).